**David and Diane BLANCETT-MADDOCK, Appellants**

**v.**

**CITY OF PITTSBURGH ZONING BOARD OF ADJUSTMENT, City of Pittsburgh and Voicestream Pittsburgh, L.P. d/b/a T–Mobile.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Jan. 22, 2010.

Decided Sept. 15, 2010.

Reconsideration and Oral Argument Denied Nov. 15, 2010.

---

David and Diane Blancett–Maddock, appellants, pro se.

Shawn N. Gallagher, Pittsburgh, for appellee, Voicestream Pittsburgh, L.P., d/b/a T–Mobile.

BEFORE: COHN JUBELIRER, Judge, LEAVITT, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge LEAVITT.

David and Diane Blancett–Maddock appeal an order of the Court of Common Pleas of Allegheny County (trial court) affirming the decision of the City of Pittsburgh Zoning Board of Adjustment (Zoning Board) to grant VoiceStream Pitts-

burgh, L.P. (T–Mobile) a special exception to construct a cellular communications tower. The Zoning Board imposed conditions on its approval of T–Mobile's special exception to cure what it described as "minor" deficiencies in T–Mobile's application. Because the record lacks evidence to support the Zoning Board's premise that T–Mobile can move the location of its cell tower in a way that will comply with the applicable zoning requirements, we will reverse.

In July 2008, T–Mobile filed an application for a special exception to construct a cell tower in a 43.77–acre cemetery owned by Bedford Memorial Park, LLC (Bedford). T–Mobile proposed to locate its 150–foot high tower on a plot of land, 40 feet by 20 feet, in a corner of the cemetery that it leased from Bedford. The cemetery is located in the Parks District in the City of Pittsburgh, where a cell tower is permitted by special exception. The ceme-

tery is bordered by Residential and Commercial Districts.

In August 2008, the Zoning Board conducted a hearing on T–Mobile's special exception application, which was opposed by area residents, including the appellants, David and Diane Blancett–Maddock. The issue at the hearing was whether T–Mobile's proposed cell tower satisfied the terms of the Pittsburgh Zoning Code (Zoning Code) for a special exception.[1]

A special exception can be granted only if the proposed use complies "with all applicable requirements of this Code...." ZONING CODE, Art. VII, § 922.07.D.1. Among those "applicable requirements" are specific standards for "communication towers." Section 911.04.A.13(a)(5) requires, *inter alia,* that access to all towers be provided by an easement, or right-of-way, at least 20 feet wide.[2] In addition, towers over 101 feet in height must satisfy the criteria set forth in Section 911.04.-A.13(c).[3] Relevant here are the require-

---

1. PITTSBURGH ZONING CODE OF 1999, TITLE NINE OF THE PITTSBURGH CODE (ZONING CODE).

2. That section provides:

   Access to the Communications Facility shall be by means of a public street or easement to a public street. *The easement shall be a minimum of twenty (20) feet in width and shall be improved to a width of at least twelve (12) feet with a dust-free, all-weather surface for the entire length.* The access shall be landscaped to the satisfaction of the Zoning Administrator.
   ZONING CODE, Art. V, § 911.04.A.13(a)(5) (emphasis added).

3. That section provides:

   (c) Communication Tower, Class B (one hundred one (101) feet to two hundred (200) feet) and Class C (two hundred one (201) feet and above)
   Communication Towers, Class B and Communication Towers, Class C shall be subject to the following standards in all districts:
   (1) Communication towers shall be located on a zoning lot complying with the yard requirements of the zoning district in which

such use is located, except that the widths of certain yards shall be as follows:
   (i) The minimum setback between communication towers and property lines of non-residentially zoned lots shall be at a distance equal to twenty (20) percent of the height of the tower;
   (ii) Communication towers shall be setback a minimum of fifty (50) feet from any existing or planned right-of-way; and
   (iii) *Communication towers shall be set back a minimum of three hundred (300) feet from the lot line of any adjacent R-zoned lot that is occupied by one (1) or more dwelling unit.*
   Peripheral and guy anchors for communication towers may be located within required yards, provided that they shall be located entirely within the boundaries of the property on which the tower is located and shall be located no closer than five (5) feet from any property line, and no closer than ten (10) feet from the lot line of an R-zoned lot that is occupied by one (1) or more dwelling units.
   (2) The tower may exceed the height limit of the zoning district in which it is located

ments that a tower over 101 feet be set back at least 300 feet from residential properties; proof that an alternative to the tower, such as placing the cell equipment on an existing building, was considered; and the placement of a fence and screening vegetation around the tower. T–Mobile's application addressed each standard in Section 911.04.A.13(a) and (c) of the Zoning Code.

At the August 7, 2008, hearing, Mike Hrycko, T–Mobile's radio frequency engineer; Jeff Jenkins, T–Mobile's site acquisition specialist; and John Craycraft, T–Mobile's project manager, appeared in support of T–Mobile's application. They did not offer direct testimony but made themselves available to respond to questions from the Zoning Board and from the objectors.

In response to inquiries, Jenkins explained that the cell tower meets the setback requirements of 300 feet. He explained that this determination was made by measuring the distance between the homes located in the Residential District bordering the cemetery and the site of the

provided it is demonstrated to Council that such height is necessary and essential for the proper functioning of the concerned tower and facilities.

(3) When a communication tower is proposed to be located in any district, the applicant shall demonstrate to satisfaction of Council that such use is reasonably necessary at the proposed location for the convenience of the people at large or for the general welfare and that a *diligent effort has been made to locate the proposed communication facilities on an existing structure*, and when the proposed site is in any residential district, that a diligent effort has been made to locate the proposed communication facility within a nonresidential district, and that due to valid considerations, including physical constraints, economic or technological feasibility, no appropriate location is available and that the use cannot reasonably serve the district from a nonresidential district. The information submitted by the applicant shall include a map of the area to be served by the tower and the relationship of the proposed site to other telecommunications towers.

(4) A fence or wall not less than six and one-half (6 1/2) feet in height from finished grade shall be constructed around each communication tower and around each guy anchor and peripheral support. The fence or wall shall comply with the following standards:

(i) Access to the tower shall be through a locked gate in the required fence or wall;

(ii) The required fencing shall consist of a masonry wall or solid fence with trees planted along the exterior of the wall or fence, or an open fence with an evergreen screen that consists of a continuous hedge with a minimum height of five (5) feet with trees planted along the exterior of the screen. Tree plantings shall consist of three-inch minimum caliper deciduous or evergreen trees planted twenty (20) feet on center maximum. Existing vegetation shall be preserved to the maximum extent possible; and

(iii) If high voltage is necessary for the operation of the communication tower and it is present in a ground grid or in the tower, signs located every twenty (20) feet and attached to the fence or wall shall display in large bold letters the following: "HIGH VOLTAGE—DANGER".

(5) Communication towers shall not encroach into or through any established public or private airport approach path as established by the Federal Aviation Administration (FAA).

(6) All obsolete or unused communication towers shall be removed within twelve (12) months of cessation of use.

(7) A communication tower shall comply with current Federal Communication Commission standards for non-ionizing electromagnetic radiation (NIER).

(8) Communication towers may be located on lots occupied by another primary use and may occupy a leased parcel on a lot meeting the minimum lot size requirement of the district in which it is located.

(9) No antenna or tower structure shall be illuminated, except as may be required by the Federal Aviation Administration (FAA) or the Federal Communication Commission (FCC).

ZONING CODE, Art. V, § 911.04.A.13(c) (emphasis added).

proposed tower. Hrycko explained that the cell tower needed to be 150 feet high in order to provide a signal sufficient to close T–Mobile's coverage gaps. Hrycko and Jenkins explained that their efforts to find an alternate site had been unsuccessful because other sites were not high enough to close the coverage gap for in-house reception caused by hills in the area that block wireless cellular signals. Craycraft explained that T–Mobile's proposed monopole cell tower structure would support at least three cellular communications carriers; would require little maintenance; and was "as quiet as a refrigerator." Notes of Testimony, 8/07/2008, at 45 (N.T. ——); Reproduced Record at 45a (R.R. ——).

In opposition to T–Mobile's application, City Council staff persons testified. Joe Day, of Councilman Jim Motznick's office, expressed concern that parks are not a good place for cell towers and that children would be able to scale the proposed 6–1/2 foot fence around the tower. Day also noted that T–Mobile's leased lot was closer than 300 feet to homes in a neighboring residential district. The borders of that particular residential district do not actually touch the borders of the cemetery because a narrow strip of land zoned commercial separates the cemetery from that residential district. However, Day contended that "adjacent," as used in Section 911.04.A.13(c)(1)(iii) of the Zoning Code, was not synonymous with "abutting." Accordingly, the cell tower violated the 300 foot setback with respect to "adjacent" homes. Ken Wolfe, from Councilman Bruce Kraus's office, objected to the location of the tower because it would intrude upon the view of homeowners.

Three property owners objected. David Blancett–Maddock expressed doubts that T–Mobile had met its burden of showing that it had attempted to locate its cell tower on an existing structure that was farther from his family's residence. He noted that there were numerous cell towers in the area that could have been used, and he agreed with Day's interpretation of "adjacent." Diane Blancett–Maddock testified that the cell tower would be visible from every floor in her house, which is located directly across the street from the proposed cell tower site. She challenged T–Mobile's claim that it could not use a cell tower located in a nearby shopping center, noting that there were no hills between that cell tower and the one proposed by T–Mobile. Dawn Harder testified that the cemetery serves as the community's park, where people walk and exercise. She complained that the cell tower will block the view of a war memorial; diminish property values; create a "huge eyesore;" and present a danger to migrating birds. N.T. 129; R.R. 129a. Finally, Harder testified that she received excellent T–Mobile service coverage inside her home and was, accordingly, skeptical about T–Mobile's claims that a coverage gap existed.

On October 2, 2008, the Zoning Board granted T–Mobile's special exception application, finding that the objectors presented only speculative concerns, not evidence. Nevertheless, the Zoning Board also found that T–Mobile's proposed use failed to satisfy two of the specific objective Zoning Code requirements: (1) the 300 foot setback from adjacent residential properties; and (2) the 20 foot wide requirement for its access road. The proposed tower was found to be less than 300 feet from "adjacent" residential lots, and the access road was only 12 feet wide. The Zoning Board agreed with the objectors that a cell tower must be 300 feet away from a residence, regardless of whether that residence is located in a residential district that touched the boundary of the cemetery. However, the Zoning Board believed T–Mobile could cure these "minor" deficien-

cies by moving the cell tower to another location in the cemetery and by widening the access road. Accordingly, it approved the special exception subject to the conditions that T–Mobile find another spot in the cemetery and widen the access road.

The objectors appealed, and T–Mobile and the City of Pittsburgh intervened in their appeal. The trial court affirmed the Zoning Board's adjudication, concluding that the record supported the Zoning Board's findings and that its conditions cured the application's deficiencies. The Blancett–Maddocks now appeal to this Court.

■ On appeal,[4] the Blancett–Maddocks raise one issue for our consideration. They contend that the Zoning Board erred by granting T–Mobile's request for a special exception because conditions cannot be used to cure an application that has been found, as here, not to satisfy the objective standards of the Zoning Code.[5] T–Mobile responds that the Zoning Board's conditions were appropriate because T–Mobile did not have the advantage of knowing the Zoning Board's "newly-announced interpretation of the 300-foot separation provision" when it prepared its application. Appellee's Brief at 9.

■ A special exception is a permitted use to which the applicant is entitled if the applicant demonstrates compliance with the specific, objective requirements contained in a zoning ordinance and if the zoning board determines that the use would not adversely affect the community. *Berlant v. Zoning Hearing Board of Lower Merion Township*, 2 Pa.Cmwlth. 583, 279 A.2d 400, 401 (1971). The applicant has the burden to show that its application complies with the specific criteria delineated in the ordinance. *Bray v. Zoning Board of Adjustment*, 48 Pa.Cmwlth. 523, 410 A.2d 909, 910 (1980). By showing compliance with the specific criteria, the applicant establishes that the proposal is presumptively consistent with the promotion of the public health, safety and welfare. *Id.* at 911. To overcome this presumption, an objector must prove to a high degree of probability that the impact from the proposed use will substantially affect the health, safety and welfare of the community to a greater extent than would be expected normally from that type of use. *Sunnyside Up Corp. v. City of Lancaster Zoning Hearing Board*, 739 A.2d 644, 650 (Pa.Cmwlth.1999). The objector does not meet its burden with speculation. *Id.*

4. Where, as here, the trial court takes no additional evidence, this Court's scope of review is limited to determining whether the zoning board manifestly abused its discretion or committed an error of law. *Broussard v. Zoning Board of Adjustment of the City of Pittsburgh*, 831 A.2d 764, 768 n. 5 (Pa. Cmwlth.2003). A zoning hearing board abuses its discretion only if its findings are not supported by "substantial evidence," that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (internal citation omitted).

5. The Blancett–Maddocks also filed an objection to T–Mobile's brief, noting that the Zoning Board was the only appellee before this Court. However, the Rules of Appellate Procedure provide that "[a]ll parties in the appellate court other than the appellant shall be appellees." PA. R.A.P. 908. The Judicial Code defines a party as a "person who commences or against whom relief is sought in a matter." 42 Pa.C.S. § 102. T–Mobile commenced this matter by applying to the Zoning Board for a special exception. The Rules further provide that "any appellant or appellee may adopt by reference any part of the brief of another." PA. R.A.P. 2137. On January 8, 2010, both the Zoning Board and the City filed a notice of joinder in the brief of T–Mobile. Accordingly, the Blancett–Maddocks' request to strike T–Mobile's brief must be denied.

■ Here, the Blancett–Maddocks contend that T–Mobile did not comply with the requirements in the Zoning Code specific to a cell tower. They argue that this Court's decision in *Elizabethtown/Mt. Joy Associates, L.P. v. Mount Joy Township Zoning Hearing Board*, 934 A.2d 759 (Pa. Cmwlth.2007) requires a reversal.

In *Elizabethtown*, a developer requested a special exception to construct a shopping center, but the application contained no information on the architectural style, signage, traffic and road improvements, and lighting, as required by the zoning ordinance. The zoning hearing board denied the application, and the developer appealed, asserting that the board should have addressed these deficiencies with conditions. This Court affirmed the zoning hearing board, explaining that

> [t]he proper function of conditions is to reduce the adverse impact of a use allowed under a special exception, *not to enable the applicant to meet his burden of showing that the use which he seeks is one allowed by the special exception.* Where, as here, the applicant fails to meet all of the ordinance requirements for a special exception, we have long held that the [zoning hearing board] properly denies the application.

*Id.* at 768 (internal citation and footnote omitted) (emphasis added). Stated otherwise, a condition is not to be used as a fudge factor by which to correct any legal shortcomings in an application for a special exception.

T–Mobile responds that *Elizabethtown* is factually distinguishable, noting that its application addressed each requirement of the Zoning Code with specific information. T–Mobile did not present a mere conceptual plan, as did the developer in *Elizabethtown*. The only reason T–Mobile's plan did not meet the setback requirements was because the Zoning Board's interpretation of the Zoning Code was not announced until the conclusion of the hearing. T–Mobile believes this case is governed by *Broussard v. Zoning Board of Adjustment of the City of Pittsburgh*, 589 Pa. 71, 907 A.2d 494 (2006).

In *Broussard*, a developer requested a special exception to renovate an historic building into a conference facility. The zoning ordinance specified parking requirements for the proposed facility. Where the parking requirements were to be satisfied by spaces in an off-site parking garage, the developer of the facility had to present a recordable lease to the off-site parking garage before it could be issued a building permit. With its special exception application, the developer submitted a letter of intent from the lessee-operator of a nearby parking garage that it had space available sufficient to serve the conference facility and would lease them to the facility. The zoning board granted the special exception for the conference facility, subject to the condition that a parking garage lease be executed and recorded by the developer prior to the issuance of the building permit. Objectors contended that the developer had to obtain the parking garage lease before it could be granted a special exception. *Broussard v. Zoning Board of Adjustment*, 831 A.2d 764 (Pa. Cmwlth.2003).

On appeal, this Court held that the zoning board had reasonably interpreted its own ordinance as not requiring the recordable form of the garage lease agreement to be included with the application for special exception; it could be submitted at the building-permit stage of the project. The Supreme Court affirmed, reasoning that

> where the plan, as submitted, addresses all of the ordinance's prerequisites for the special exception sought, and reasonably shows that the property owner is able to fulfill them in accordance with

the procedures set forth by the zoning code (as reasonably interpreted by the board), a reviewing court should not reverse the grant of such an exception on the sole basis that some of the items described in the plan may be completed at a later date.

*Broussard,* 589 Pa. at 84, 907 A.2d at 502. The Supreme Court explained that it would make little sense to force a property owner to undertake the expense of leasing spaces in a parking garage if the special exception may not be granted in the end. *Id.* at 81, 907 A.2d at 500.

We agree with T–Mobile that the present case is factually distinguishable from *Elizabethtown* because T–Mobile submitted a detailed plan and not a mere conceptual plan. However, it is also true that the Zoning Board found that the location of T–Mobile's proposed cell tower violated requirements of the Zoning Code. This finding distinguishes this case from *Broussard.* As established in *Elizabethtown,* conditions are not to be used to cure violations of a zoning ordinance.

T–Mobile's application included a report of a surveyor, who measured distances between the proposed cell tower and homes located in the residential district that actually abutted the property lines of the cemetery. However, the surveyor did not take similar measurements for homes in the adjacent residential district separated from the cemetery by the narrow commercial district. The homes in this second residential district lie within 300 feet of the site for T–Mobile's cell tower. The Zoning Board explained that the cemetery "is so large and the failed conditions can be met by minor, but not *de minimis,* revisions to the site plans." Zoning Board's Adjudication at 13; R.R. 146a. By "failed conditions," the Zoning Board means that T–Mobile's application, as submitted, failed to satisfy the requirements of the Zoning Code.

This is not a *Broussard* case, where the applicant's submissions addressed the ordinance's prerequisites for the special exception sought, and reasonably showed that the applicant was ready, willing and able to fulfill them in accordance with the specific procedures in the ordinance. Here, it cannot be discerned from the record evidence that T–Mobile can satisfy the setback requirements in the Zoning Code by moving its cell tower within its current leasehold with Bedford Memorial Park. Nor was there evidence that Bedford is willing to allow T–Mobile to widen the access road. The fact that the cemetery may accommodate another location for T–Mobile's proposed cell tower is also beside the point. There is no evidence that Bedford is willing to negotiate another lease, let alone a basis for determining whether that new location could satisfy each and every requirement in the Zoning Code applicable to cell towers.

Section 922.07.D.1 of the Zoning Code provides that a special exception will be granted *only* if the proposed use is determined to comply with all applicable requirements of the Code. Here, the proposed cell tower was found not to satisfy the terms of the Zoning Code, and there is no support in the record for the Zoning Board's finding that T–Mobile can cure these "minor" deficiencies by revising its site plan to relocate the cell tower and widen the access road. In short, the Zoning Board erred by using conditions to make T–Mobile's unsatisfactory application satisfactory. Accordingly, we must reverse.

### ORDER

AND NOW this 15th day of September, 2010, the order of the Court of Common Pleas of Allegheny County, dated Septem-

ber 2, 2009, in the above-captioned matter is hereby REVERSED. The request of Appellants David and Diane Blancett–Maddock to strike the brief of Appellee, VoiceStream Pittsburgh, L.P., is DENIED.