# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Northeast Pennsylvania SMSA Limited  :
Partnership d/b/a Verizon Wireless,    :
                       Appellant    :
                                   :
           v.                   :
                                   :
The Throop Borough Zoning Hearing  :   No. 372 C.D. 2016
Board                             :   Argued: December 12, 2016


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE JAMES GARDNER COLINS, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                         FILED: January 5, 2017


Northeast Pennsylvania SMSA Limited Partnership d/b/a Verizon Wireless (Verizon) appeals from the Lackawanna County Common Pleas Court's (trial court) February 10, 2016 order affirming the Throop Borough (Borough) Zoning Hearing Board's (ZHB) order denying Verizon's zoning permit application (Application). The issues before this Court are: (1) whether substantial evidence supported the ZHB's decision that Verizon's proposed use would substantially affect the community's health, safety and welfare; and, (2) whether the ZHB erred or abused its discretion by refusing to grant a *de minimis* variance.

Verizon is authorized by the Federal Communications Commission (FCC) to operate a wireless communications system in Lackawanna County, Pennsylvania.[1] In accordance with its FCC license, Verizon is required to provide

---

[1] *See* Reproduced Record at 105a-109a.

wireless signal strength sufficient for proper reception and communication for its customers. As a result of poor wireless service in portions of the Borough caused by weak signal strength, Verizon's engineers determined that a wireless communications facility with a 120-foot monopole was necessary in that area. For that reason, Verizon leased from Scranton Craftsmen, Inc. (SCI), 4,800 square feet of land located at 930 Dunmore Street (Property) in the Borough's Light Industrial (I-1) Zoning District for installation of an unmanned communications facility. Directly abutting SCI's Property are residential properties located on Dudley Street, in the Borough's residential district.

Section 507(3)(d) of the Borough's Zoning Ordinance (Ordinance) permits "[r]adio and television transmission or receiving towers" by special exception in the Borough's I-1 Zoning District. Ordinance § 507(3)(d). Section 507(5)(b) of the Ordinance requires that "[t]he maximum land area covered by buildings shall be 25%, and the maximum total impervious cover shall be 40%." Ordinance § 507(5)(b). Section 603(19) of the Ordinance further provides:

> Any radio and television transmission or receiving tower [located in an I-1 Zoning District] shall be set back from all tract boundary lines a distance equal to 1.2 times its height, and the base of such tower shall be surrounded by a chain-link fence and locked gate a least six (6) feet high and located at least six (6) feet from the outer edge of the base. The fence and gate shall be maintained in good condition.

Ordinance § 603(19).

On or about March 16, 2015, Verizon and SCI filed the Application seeking to construct on the Property

> a new communications facility [(Facility)] including a[] 120' monopole having an overall height of 125'[,] factoring in the height of a 5' lighting [sic] rod[,] and associated improvements and equipment including a 12' x 20' platform with canopy for equipment cabinets, concrete

2

generator pad, outdoor generator, propane tank, cable ice bridge and an 8' chain[-]link fence.

Reproduced Record (R.R.) at 97a.  Verizon and SCI sought a variance

> [f]rom Section 603(19) [of the Ordinance] to allow setbacks less than 1.2 times [] the height of the tower from adjacent property lines; [and] from Section 507(5)(b) [of the Ordinance] to allow the maximum land area covered by buildings to exce[e]d 25[%] and to allow the maximum total impervious coverage to exceed 40[%].

R.R. at 101a.  In addition, Verizon and SCI sought a special exception "[i]n accordance with Section 507(3)(d) [of the Ordinance] to allow [Verizon] to construct a 120' monopole with an overall height of 125'."  R.R. at 101a.

The ZHB held a hearing on April 22, 2015, at the conclusion of which it denied the Application.  On May 22, 2015, the ZHB issued its written decision denying the special exception portion of the Application due to height and noise concerns raised by nearby residential neighbors, and concluded that since it denied the special exception, it need not decide the variance portion of the Application.  Verizon appealed from the ZHB's decision to the trial court.  Without taking additional evidence, on February 10, 2016, the trial court affirmed the ZHB's decision denying Verizon's Application.  On March 3, 2016, Verizon appealed to this Court.[2]  The trial court's opinion was issued on March 16, 2016.

---

[2]  When no additional evidence is taken following the determination of a [ZHB], this Court's scope of review is limited to determining whether the [ZHB] committed an error of law or a manifest abuse of discretion in rendering its decision.  An abuse of discretion occurs when the findings are not supported by substantial evidence in the record.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*JoJo Oil Co., Inc. v. Dingman Twp. Zoning Hearing Bd.*, 77 A.3d 679, 685 n.6 (Pa. Cmwlth. 2013).

3

Verizon argues that substantial evidence did not support the ZHB's decision that Verizon's proposed use would substantially affect the community's health, safety and welfare. We agree.

> **A special exception is a permitted use** to which the **applicant is entitled if the applicant demonstrates compliance with the specific, objective requirements contained in a zoning ordinance and if the [ZHB] determines that the use would not adversely affect the community**. The applicant has the burden to show that its application complies with the specific criteria delineated in the ordinance. By showing compliance with the specific criteria, the applicant establishes that the proposal is presumptively consistent with the promotion of the public health, safety and welfare. To overcome this presumption, an objector must prove to a high degree of probability that the impact from the proposed use will substantially affect the health, safety and welfare of the community to a greater extent than would be expected normally from that type of use. The objector does not meet its burden with speculation.

*Blancett-Maddock v. City of Pittsburgh Zoning Bd. of Adjustment*, 6 A.3d 595, 600 (Pa. Cmwlth. 2010) (citations omitted; emphasis added).

In this case, Section 602 of the Ordinance prescribes, in relevant part:

> Decisions of the [ZHB regarding special exceptions] shall be made pursuant to standards and criteria expressed in this [Ordinance] Article [6], to regulations for the respective districts in which the uses are located, and to all other requirements of this [O]rdinance. Further, only those uses which are specifically enumerated as Special Exception Uses in the appropriate table for the Zon[ing] District may be reviewed as to establishment of said use in said Zon[ing] District.
>
> **The [ZHB] shall grant an approval for a special exception use only if it finds adequate evidence that the proposed use meets both the general and specific requirements for such use**.

4

Ordinance § 602 (emphasis added).  Section 602(4) of the Ordinance lists general

criteria for special exceptions:

> Decisions for granting all special exception uses shall be guided by the following **general standards**:
>
> a.  The proposed use shall not jeopardize the objectives of the Comprehensive Plan.
>
> b.  Public services and facilities such as streets, sewers, water, police and fire protection shall be adequate for the proposed use.
>
> c.  Existing and future streets and access to the site shall be adequate for emergency services, for avoiding undue congestion, and for providing for the safety and convenience of pedestrian and vehicular traffic.
>
> d.  The relationship of the proposed use to other activities existing or planned in the vicinity shall be harmonious in terms of the location and size of the site relative to the proposed operation, and the nature and intensity of the operation involved.
>
> e.  The relationship of the proposed use to other activities existing or planned in the vicinity shall be harmonious in terms of the character and height of buildings, walls, and fences so that the neighboring property is not impaired.
>
> f.  The proposed use shall not be more objectionable in its operation in terms of noise, fumes, vibrations, smoke, fly ash, or flashing lights than would be the operations of any permitted use in the district.
>
> g.  Any other reasonable conditions and safeguards, in addition to those expressed in this Ordinance, may be implemented by the [ZHB] if the [ZHB] deems it necessary for implementing the purposes of the [MPC]. . . and this Ordinance.

Ordinance § 602(4) (emphasis added).  Section 603 of the Ordinance lists "**Specific

Provisions**" that special exception applicants must satisfy.  Ordinance § 603.  In

particular, pursuant to Section 603(19) of the Ordinance, Verizon had the burden, at a

minimum, to prove that the proposed Facility would satisfy the specific conditions for telecommunications towers set forth therein (*i.e.*, fencing and setback requirements).

At the ZHB hearing, Borough zoning officer Robert Lokuta (Lokuta) testified that Verizon's Application was in order and accurately represented what Verizon needed for its proposed use on the Property. Lokuta also reported that he conducted a walk-through at the Property and confirmed it was consistent with Verizon's submitted plans.

Verizon presented the testimony of Rettew Associates' registered landscape architect Donald E. Brinser (Brinser). Brinser described that the Property currently consists of two parcels, and that Verizon proposes to place the 60 by 80 foot Facility near the center of the Property, abutting an existing building that straddles the line bisecting the two parcels. Brinser articulated that the Facility would be located 76 feet from the bisecting line, and approximately 350 feet from the Property line abutting Skymanski Boulevard.[3] Brinser explained that Verizon attempts to locate towers along property lines or against existing structures "so it's not sticking out in the middle of an open area." R.R. at 75a.

Brinser pronounced that the proposed tower will be constructed of galvanized steel with a non-reflective finish, larger at the bottom and tapered toward the top, with a lightning rod, and not lit in any capacity. He expressed that, in addition to the tower, the Facility will consist of canopy-covered electric equipment cabinets, a generator on a concrete pad, a propane fuel tank and a single parking space to accommodate the maintenance truck that will attend to the Facility once or twice per month. Brinser stated that the Facility will be surrounded by an 8 foot high

---

[3] Skymanski Boulevard is an undedicated paper street used as SCI's access driveway. *See* R.R. at 36a.

chain-link fence with barbed wire and will have a locked gate.[4] He related that the power feed will be installed underground from Skymanski Boulevard along Verizon's easement to an existing utility pole. He further reported that Verizon proposes to accommodate up to two additional carriers on the tower.[5]

Brinser testified that the majority of the Property is 96% covered either by buildings (25.5%) and paving or stone material, which exceeds the limitations set forth in Section 507(5)(b) of the Ordinance. He claimed that the 240-square foot Facility would increase the Property's building coverage less than 1% and, since the Facility would be developed on an already-graveled, impervious area, "[t]here would be a match and there would be no increase to that impervious coverage." R.R. at 23a. Brinser calculated that the Facility's impact would be a *de minimis* .0006%.

Brinser acknowledged that Verizon's proposed tower exceeds the Borough's height limitation, since Section 607(19) of the Ordinance requires the tower to be located at least 150 feet (1.2 x 125=150 feet), rather than 76 feet, from the adjacent interior Property line. However, Brinser articulated that, due to the existing buildings and access, it would be impossible to place the tower in another location on the Property and meet the 150-foot requirement.

Brinser described that Michael Chorba owns the property closest to the Facility, approximately 150 feet directly east and 305 feet south from the Facility, across Skymanski Boulevard. He recounted that the Borough's residential district line is located approximately 290 feet northwest of the Facility. He specified that

---

[4] The Facility will be located behind 100 square feet of surrounding fence, approximately 5 feet from the abutting building. *See* R.R. at 21a, 35a.

[5] The proposed tower would contain 4 antennas (approximately 8 feet tall, 12-14 inches wide and 3 to 4 inches deep) that would extend approximately 4 feet above the tower's top. *See* R.R. at 46a-47a. The tower could accommodate an additional 8 antennas in lower sectors. *See* R.R. at 46a.

since the Facility will be located near the center of SCI's parcels, the nearest adjoining property is located well outside a 150-foot radius surrounding the tower.

Brinser expressed that the Facility's generator will be programmed to run in a test mode approximately twice per month for 20 to 45 minutes, but would otherwise be operated only in the event of a power outage. He suggested that the test timer could be adjusted to suit the community. Brinser explained that the generator is "vital" because residents and local police rely heavily on cell phones during emergencies. R.R. at 25a. He does not anticipate that the generator will create excessive or unreasonable noise. Brinser introduced the generator's noise specifications which reflect that, at 21 feet away, the generator's sound level is 58 decibels. *See* R.R. at 103a. He added that most municipalities limit sound to 60 decibels at a property line. He concluded that since the nearest residential property would be 290 feet from the generator, the generator's noise would be "severely reduced below that[;] . . . it would be less than what you're going to hear from a lawnmower on an adjacent property." R.R. at 25a-26a. Brinser also pointed out that, depending upon the residential property, there is at least one, but possibly two, existing buildings shielding them from where the generator would be operated.

Verizon offered an April 21, 2015 Radio Frequency Design Analysis prepared by Andrew M. Petersohn, P.E. (Petersohn) of dBm Engineering, P.C. for the ZHB's consideration, in which Petersohn concluded:

> In my professional opinion, the proposed [F]acility is extremely well[-]suited to provide enhanced wireless service to portions of [the] western Borough and the surrounding municipalities that currently suffer from inadequate capacity and in-building coverage. The proposed [F]acility is the only feasible alternative that will satisfy the design objective of this search ring. The design, location, and proposed antenna height are the least intrusive means of providing adequate service for [Verizon] subscribers in the targeted geography. The proposed

8

antenna height is the absolute minimum acceptable in order
to achieve a high percentage of the site's design goals.

R.R. at 111a; *see also* R.R. at 111a-117a.

Verizon also presented the testimony of expert radio frequency engineer
Joseph Ruiz (Ruiz) with regard to Verizon's proposed Facility placement. He related
that the FCC mandates Verizon to provide coverage sufficient for area customers to
access the network and for passersby to maintain coverage while traveling through
the area. He explained that, based upon Verizon's network traffic analysis, Verizon's
Dunmore and Dickson City sites were over capacity, so a tower needed to be added
between them and the Olyphant site to alleviate the problem. Ruiz described that an
analysis was conducted for Verizon to determine what field locations would satisfy
its coverage and capacity obligations. According to Ruiz, based upon Pennsylvania's
terrain, the proposed Facility will have a service radius of approximately 2½ miles.
Ruiz agreed with Petersohn's conclusion that the proposed tower is the minimum
necessary, and that there were no other viable tall structures within the vicinity that
would alleviate Verizon's coverage and capacity issues.[6]

Verizon offered an April 21, 2015 Interference Analysis for the proposed
Facility prepared by Petersohn, in which Petersohn concluded "that no potential
exists for the manifestation of harmful interference as a result of the proposed
[Verizon] telecommunications [F]acility[, and] . . . that [Verizon] will be operating in
full compliance with all applicable standards as outlined in [its FCC] licensure." R.R.
at 119a; *see also* R.R. at 119a-121a. Ruiz confirmed that since each FCC licensee

---

[6] Ruiz described that, while a large, 500-foot tower on a ridge would have satisfied
Verizon's customer needs early on, the tremendous growth in the use of cell phones and other
devices over the years has necessitated smaller, more intermittent sites to provide sufficient
capacity. He further testified that building a taller tower would exacerbate Verizon's problems
because it has a finite number of channels, and a taller tower would cause interference with its own
network. Ruiz added that building the tower farther away would shift the coverage area to a
location where it could not effectively offload the overloaded sites.

operates within its own band, the proposed tower will not transmit or receive the same frequencies as or interfere with any other communications in the Borough or the surrounding region, particularly not radio or television reception or public safety transmissions.

Verizon also offered an April 21, 2015 Electromagnetic Exposure Analysis for the proposed Facility prepared by Petersohn, in which Petersohn concluded, in pertinent part:

> The maximum exposure to radio-frequency emissions from the proposed [Verizon] [F]acility will be far below FCC exposure limits. Using upper limit assumptions for the [Verizon] equipment configuration, the cumulative radio-frequency exposure levels would be at least two-hundred (200) times less than the FCC limits at all locations of public access.

R.R. at 123a; *see also* R.R. at 123a-128a. Ruiz explained that "if [Verizon] put 199 sites right here similar to the one [it is] proposing[,] [it] would still be below the allowable limits." R.R. at 50a. Thus, Ruiz avowed that the proposed Facility will operate well within the FCC's parameters governing human exposure to electromagnetic radiation.

In addition, Verizon offered an April 17, 2015 Federal Aviation Administration's (FAA) Notice Criteria Tool Screening report in which Petersohn declared that "lighting and/or marking of the [proposed F]acility will not be required." R.R. at 130a; *see also* R.R. at 130a-133a. Verizon also produced an April 20, 2015 Pennsylvania (PA) Bureau of Aviation Screening report prepared by Petersohn, in which Petersohn concluded that "Mr. Randy Haldeman, PA Aviation Specialist for the [PA] Bureau of Aviation, has deemed that this facility is 'not an obstruction' under [the] PA aviation code and that 'the PA Bureau of Aviation has no objection to this proposal[.]'" R.R. at 135a; *see also* R.R. at 135a-137a.

10

Finally, Verizon presented the testimony of its site acquisition consultant Paul Devlin (Devlin). Devlin explained that after he received Verizon's specifications for the Facility, he drove there, and identified two locations suitable from a location and elevation standpoint – the little league baseball field and the Property. He recalled that he examined tax and zoning maps and inquired of landowner interest; however, due to planned field renovations, the booster club declined Verizon's proposal. Devlin was unable to state whether or how much the Facility may depreciate the value of nearby residential properties.

Several neighbors (collectively, Objectors) testified before the ZHB in opposition to the Application. Gary Bepler (Bepler) stated that his issues with the Facility are his property's depreciation, and that, for years he has had to "look at enough of [SCI's] junk . . . in front of the place . . . , without having to look at a tower now in my front window."[7] R.R. at 78a. Bepler also related his worry that the tower "is going to be one more attractant for light[]ning in the neighborhood." R.R. at 80a.

Dennis Savitski (Savitski), who resides at 103 Eddy Street and also owns property around the corner on South Valley Avenue, expressed concern that the Facility's presence will cause his property value to depreciate. He stated that he "owns the [South Valley Avenue] property right across the street from" the proposed Facility and, "was hoping to put a house up eventually for [his] children, and they're going to be looking right at this tower." R.R. at 70a. Savitsky requested that Verizon retain an appraiser to evaluate property depreciation possibilities. He further articulated his concern that if SCI goes out of business, the Facility will remain, and the neighbors would be "stuck with it." R.R. at 79a.

Michael Chorba (Chorba), of 831 Dudley Street, expressed his concern that the children playing in the residential yards will be exposed to generator noise

---

[7] Bepler's address is not stated in the ZHB transcript.

11

above the SCI truck traffic that already exists. He acknowledged that although the Property is in the I-1 Zoning District, the tower "should be in a totally different area." R.R. at 80a.

Timothy Vanston (Vanston) testified that the Facility "would be an eyesore," and that he was worried about "the noise factor of those generators running."[8] R.R. at 80a.

Carol Asman (Asman), of 2 Marion Circle, expressed concern about the potential depreciation of her property's value, the generator noise, "safety" and "the light[]ning factor." R.R. at 81a. She called for Verizon to appraise their properties, and questioned whether the Borough would lose tax revenue if properties depreciate in value. Paul Asman inquired what Verizon is paying SCI for the Property's use.

Matthew Chorba, of 825 Dudley Street, testified that since he receives satisfactory coverage as a Verizon customer and the Property already exceeds allowable coverage limits, the Ordinance does not work a hardship for Verizon or SCI. He expressed that even a .00001% impact increase over what already exists far exceeds the Ordinance's limitations and, thus, is an unnecessary increase. Matthew Chorba acknowledged that the Property is in the I-1 Zoning District, but was concerned because it is bounded by residential uses. He suggested that the Facility be placed in a commercial zoning district located ¼ or ½-mile away that is not surrounded by residences.

> Based upon the evidence presented, the ZHB concluded:
>
> In the present case significant testimony was offered by [Verizon's] expert witnesses. The surrounding neighbors opposing the project also presented extensive testimony. In considering all the evidence submitted by both [Verizon] as well as the surrounding neighbors as well as the plans submitted by [Verizon], the [ZHB] hereby **denies**

---

[8] Vanston's address is not stated in the ZHB transcript.

12

> **[Verizon's] request for a special exception to erect the tower in question**. The [ZHB] notes as a **basis for its decision** that the subject [P]roperty **is surrounded by residential neighborhoods**. The **height of the proposed structure would not be in line with the character of those adjoining neighborhoods**. The [ZHB] **also noted** and recognized the **concerns of the neighbors regarding noise in the use of the generator on site**. **Although** [Verizon] **presented testimony regarding the decimal** [**sic**] **levels**, the concern of operation of a generator at least at forty-five (45) minute intervals, twice a month **would not be harmonious to the neighborhood**. The [**ZHB**] **feels** that the **proposed use would jeopardize the objective of the plan for the zoning in the** [**Borough**].

ZHB Dec. at 9-10 (emphasis added).

Although the ZHB did not expressly conclude that Verizon met its burden of proving that the proposed Facility would meet Ordinance Section 603(19)'s specific fencing and boundary line setback requirements, it is clear that was the case since the ZHB's conclusion was based solely upon the Facility's effect on the neighborhood, which is only relevant <u>after</u> the ZHB determined that Verizon met the Ordinance's objective special exception criteria.[9] *See Blancett-Maddock*. Moreover, the ZHB made findings that Verizon's proposed Facility would satisfy Section 603(19) of the Ordinance's objective special exception requirements.

Specifically, the ZHB found that the fence surrounding the proposed Facility would be 8 feet high and would measure 50 feet x 50 feet. *See* ZHB Finding of Fact (FOF) 13. In addition, because the ZHB deemed the Property a single lot for purposes of this Application, it found that the tower met Ordinance Section 603(19)'s

---

[9] Although under Section 1006(1)(d) of the Ordinance, the Objectors' testimony regarding whether granting the variances would alter the essential character of the district is also material to the ZHB's decision to grant or deny Verizon's variance requests, that is not the purpose for which the ZHB relied upon the testimony in this instance. *See* Ordinance § 1006(1)(d). Notably, the ZHB's only reference to Verizon's variance requests was that the ZHB was "not required . . . to consider [them]" because it denied the special exception. ZHB Dec. at 10.

boundary line setback requirement.[10] In particular, the ZHB found that the Property is "bounded by Cypress Street, South Valley Avenue, Dunmore Street and Symansk[i] Boulevard," which represents the perimeter of the conjoined parcels. FOF 3. The ZHB also made findings regarding the Property's maximum building-covered land area and total impervious coverage based upon the two combined parcels, rather than the single parcel upon which the tower would be placed. *See* FOF 3 ("the majority of the [P]roperty was covered by building, paving or stone material"); *see also* FOF 14 (the Property's current building coverage is 25.5%), FOF 15 (the Property's existing impervious coverage is 96%). The ZHB further found that

---

[10] Throughout its decision, the ZHB referred to the Property in the singular, as "the property" or "the subject property." ZHB Dec. at 1-10. Notably, the only exception was in the ZHB's description that "the location of the pole will be very close to the property line that bisects the two subject properties of [SCI]." FOF 4. Verizon acknowledges the tower's placement satisfies the setback requirement "with respect to all adjacent property lines . . . ." Verizon Br. at 16.

A single-lot determination is supported by the lot merger doctrine, which permits two adjacent lots to be merged into a single lot based upon the manner in which the common landowner uses them. *See Alpine, Inc. v. Abington Twp. Zoning Hearing Bd.*, 654 A.2d 186 (Pa. Cmwlth. 1995). A physical manifestation of an intent to merge adjoining properties is the common owner's placing of a permanent structure (here, two buildings) across the property line. *Price v. Bensalem Twp. Zoning Hearing Bd.*, 569 A.2d 1030, 1034 (Pa. Cmwlth. 1990) (wherein this Court held that "the fact that [the common owner] blacktopped a contiguous section of both lots" was sufficient to support merger).

We acknowledge that "merger of lots shall not be presumed," and "is only triggered where a local municipality has adopted a merger of lots provision." *Loughran v. Valley View Developers, Inc.*, 145 A.3d 815, 822 (Pa. Cmwlth. 2016). "Historically, the doctrine of merger has been applied to cases where adjacent *non-conforming* lot(s) were brought into common ownership." *Springfield Twp. v. Halderman*, 840 A.2d 528, 530 (Pa. Cmwlth. 2004); *see also Daley v. Zoning Hearing Bd. of Upper Moreland Twp.,* 770 A.2d 815 (Pa. Cmwlth. 2001); *Tinicum Twp. v. Jones*, 723 A.2d 1068 (Pa. Cmwlth. 1998); *Alpine, Inc.*; *Jacquelin v. Zoning Hearing Bd. of Hatboro Borough*, 558 A.2d 189 (Pa. Cmwlth. 1989). Here, Section 802(1) of the Ordinance expressly authorizes the merger of adjacent non-conforming lots owned by the same owner. Ordinance § 801(1). SCI owns both of the Property's parcels, ZHB's counsel represented at argument to this Court that the parcels were nonconforming, and SCI's construction of two buildings across the internal boundary line is a clear physical manifestation of an intent to merge adjoining properties. *Price.*

Under the circumstances, the ZHB properly considered SCI's two parcels a single lot for purposes of Verizon's Application. Accordingly, Verizon's variance request is moot.

14

"the nearest adjoining property is outside of the [150]-foot mark and is at least [450-]feet away from the pole itself." FOF 9.

Because the ZHB determined that Verizon satisfied the Ordinance's objective special exception requirements, **Verizon's proposed Facility is a** "**use that is expressly permitted by the** [**Ordinance**], absent a showing [by the Objectors] of a detrimental effect on the community." *Morrell v. Zoning Hearing Bd. of the Borough of Shrewsbury*, 17 A.3d 972, 975 (Pa. Cmwlth. 2011) (emphasis added); *see also Freedom Healthcare Servs., Inc. v. Zoning Hearing Bd. of the City of New Castle*, 983 A.2d 1286 (Pa. Cmwlth. 2009). "The burden that is placed upon the objectors **requires more than mere speculation of possible harm**." *In re Appeal of Thompson*, 896 A.2d 659, 679 (Pa. Cmwlth. 2006) (emphasis added). Rather, the law requires that "objector[s] must prove to a **high degree of probability** that the impact from the proposed use will substantially affect the health, safety and welfare of the community **to a greater extent than would be expected normally from that type of use**." *Blancett-Maddock*, 6 A.3d at 600 (emphasis added). Moreover, this Court has consistently held that protection of neighborhood **aesthetics and property values are insufficient bases upon which to deny special exceptions.** *Wyomissing Area Sch. Dist. v. Zoning Hearing Bd. of Wyomissing Borough*, 128 A.3d 851 (Pa. Cmwlth. 2015).

Notwithstanding, the ZHB denied the Application based on the following findings:

> 21. [Bepler] . . . is concerned about the **depreciation** of his property as well as the **unsightly view** of having to look at this tower being close by to the [SCI P]roperty.
>
> 22. [Savitski] . . . had concerns about the **depreciation** of his property not only on South Valley Avenue but around the corner where he resides at 103 Eddy Street. He also had concerns that **if** [**SCI**] **went out of business or closed**

15

**down that the tower would be** present and would create a hardship to the community in having it **left there**.

23. . . . Chorba's concerns were that they were placing a cellular tower . . . right **in the middle of adjacent residential areas**. He also suggested that [Verizon] seek alternate sights away from residential areas.

24. [Vanston] next testified and indicated that the tower would be an **eyesore** and was also concerned with the **noise factor of the generators running** and disturbing the neighborhood.

25. [Asman] . . . was also concerned about the **depreciation** of h[er] property and felt that Verizon did not do a good enough job in finding locations in other areas. [Sh]e also had a concern about **safety** in the community as well as the **noise of the generator**.

26. [] Matthew Chorba . . . also had concerns about the **aesthetics** of the tower being right in the middle of surrounding residential districts.

ZHB Dec. at 7-8 (emphasis added). The ZHB did not make any findings or base its conclusion on evidence that to "a high degree of probability that the impact from the [Facility would] substantially affect the health, safety and welfare of the community to a greater extent than would be expected normally from that type of use." *Blancett-Maddock*, 6 A.3d at 600.

The ZHB acknowledged in its decision that "significant testimony was offered by [Verizon's] expert witnesses," ZHB Dec. at 9, yet denied the Application based solely upon the Objectors' general, speculative testimony that the tower's height and the generator's noise "would not be in line with the character of th[e] adjoining neighborhoods."[11] ZHB Dec. at 10. The ZHB clearly overlooked that "[a]

---

[11] For example, in reaching its decision, the ZHB made findings based on Brinser's testimony that the generator would run in test mode twice monthly for approximately 20 to 45 minutes and, otherwise, only when necessary during power outages. *See* FOF 12. The ZHB also found that the generator would be located at least 290 feet away from the nearest residence. *See*

16

special exception is neither special nor an exception, but a use expressly contemplated that evidences a legislative decision that the particular type of use is consistent with the zoning plan and presumptively consistent with the health, safety and welfare of the community." *Greth Dev. Grp., Inc. v. Zoning Hearing Bd. of Lower Heidelberg Twp.*, 918 A.2d 181, 188 (Pa. Cmwlth. 2007); *see also Broussard v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 831 A.2d 764 (Pa. Cmwlth. 2003), *aff'd*, 907 A.2d 494 (Pa. 2006).

Section 507(1) of the Ordinance reflects that the Borough's I-1 Zoning District purpose "is to provide for light industrial . . . and related service activities[, including communication transmission or receiving towers,] which . . . can be located near residential neighborhoods . . . ." Ordinance § 507(1). Since the Borough's governing body has expressly permitted communications towers in the I-1 Zoning District by special exception, *see* Ordinance § 507(3), the Borough has already determined that Verizon's proposed tower and its generator are presumptively harmonious with the surrounding neighborhoods. *Greth*. Therefore, absent substantial evidence of "a high degree of probability that the impact from the [Facility would] substantially affect the health, safety and welfare of the community to a greater extent than would be expected normally from that type of use[,]" *Blancett-Maddock*, 6 A.3d at 600, the ZHB was required by the Ordinance to grant the Application.

We acknowledge that "a ZHB's interpretation of its own zoning ordinance is entitled to great deference and weight." *Hafner v. Zoning Hearing Bd. of Allen Twp.*, 974 A.2d 1204, 1210 (Pa. Cmwlth. 2009).

---

FOF 9. Notably, the ZHB made no findings based on Brinser's testimony that the generator's noise would be less than the sound of a lawnmower at the nearest residential property, or that Verizon would adjust the testing dates and times to suit the community.

17

> **However, a [ZHB]** is not a legislative body, and it lacks authority to modify or amend the terms of a zoning ordinance. '[ZHBs] . . . **must not impose their concept of what the zoning ordinance should be**, **but rather their function is only to enforce the zoning ordinance in accordance with the applicable law**.' Thus, the [ZHB] is required to apply the terms of the Zoning Ordinance <u>as written</u> rather than deviating from those terms based on an unexpressed policy.

*Greth*, 918 A.2d at 187 (citation omitted; emphasis added) (quoting *Ludwig v. Zoning Hearing Bd. of Earl Twp.,* 658 A.2d 836, 838 (Pa. Cmwlth. 1995)). The ZHB in this case clearly "departed from its function of determining whether the proposed use fell within the terms of the [Ordinance] and focused instead on implementing goals that it believed fell within the spirit of the legislative enactment." *Greth*, 918 A.2d at 189.

Under circumstances in which Verizon proved by substantial evidence that the Facility meets the Ordinance's specific special exception criteria, and the Objectors failed to meet their burden of proving to "a high degree of probability that the impact from the [Facility would] substantially affect the health, safety and welfare of the community to a greater extent than would be expected normally from that type of use[,]" *Blancett-Maddock*, 6 A.3d at 600, the ZHB erred by denying the Application.[12]

---

[12] The ZHB did not consider Verizon's variance requests. The ZHB stated that, even if it were to consider Verizon's variances, it would deny them "based upon the significant building coverage of [SCI]." ZHB Dec. at 10. In light of our holding, we need not decide whether Verizon was entitled to a dimensional variance on a *de minimis* basis.

Notwithstanding, the ZHB's counsel represented at argument that SCI's coverage is non-conforming. Section 801(4)(c) of the Ordinance allows extensions of non-conforming uses by special exception if, *inter alia*, they do not violate the Ordinance's coverage requirements, and "[t]he extension is not more than . . . (33%) of the . . . floor or land area as it existed at the time the structure or use first became non[-]conforming." Ordinance § 801(4)(c). Since the Property's coverage was permitted as non-conforming, it does not violate the Ordinance. Moreover, based upon the ZHB's findings that "[Verizon] is seeking less than one percent increase [i]n the existing [non-conforming building coverage]," FOF 14, and "there will be no increase in impervious

18

Based on the foregoing, we reverse the trial court's order and remand to the trial court with instructions to remand the matter to the ZHB to grant the Application.

_____
ANNE E. COVEY, Judge

---

coverage," FOF 15, to the extent granting the special exception in this case would constitute an increase, it would be far less than 33%.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Northeast Pennsylvania SMSA Limited  :
Partnership d/b/a Verizon Wireless,    :
                              Appellant  :
                                         :
                  v.                     :
                                         :
The Throop Borough Zoning Hearing  :    No. 372 C.D. 2016
Board                                    :


O R D E R

AND NOW, this 5th day of January, 2017, the Lackawanna County Common Pleas Court's (trial court) February 10, 2016 order is reversed. This matter is remanded to the trial court to immediately remand to the Throop Borough Zoning Hearing Board (ZHB) with the direction to grant Northeast Pennsylvania SMSA Limited Partnership d/b/a Verizon Wireless's and Scranton Craftsmen, Inc.'s special exception application within 45 days of the ZHB's receipt of the trial court's remand order. Should the ZHB determine within this 45-day period, and within the confines of the Ordinance's objective standards, that any conditions should be attached to the special exception in order to ensure compliance with the Ordinance, the ZHB shall specify the applicable Ordinance provision and explain why the condition is necessary.

If the ZHB fails to act, or acts contrary to this Court's directives, any party may seek enforcement of this Order pursuant to Pa.R.A.P. 2591(b).


_____
ANNE E. COVEY, Judge