# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Atlantic Wind, LLC | : | |
| | : | |
| v. | : | |
| | : | |
| Zoning Hearing Board of Penn Forest Township | : | |
| | : | |
| Bethlehem Authority | : | |
| | : | |
| v. | : | |
| | : | |
| Zoning Hearing Board of Penn Forest Township | : | |
| | : | |
| Appeal of: Bethlehem Authority | : | No. 585 C.D. 2020 |
| | : | |
| | : | |
| Atlantic Wind, LLC, | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| Penn Forest Township Zoning Hearing Board | : | No. 591 C.D. 2020 |
| | : | |
| | : | |
| Bethlehem Authority | : | |
| | : | |
| v. | : | |
| | : | |
| Penn Forest Township Zoning Hearing Board | : | |
| | : | |
| Appeal of: Atlantic Wind, LLC | : | No. 20 C.D. 2021 |
| | : | |
| | : | |
| Bethlehem Authority, | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| The Zoning Hearing Board of | : | No. 242 C.D. 2021 |
| Penn Forest Township | : | Argued:  December 13, 2021 |

BEFORE:    HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                                    FILED:  January 12, 2022

Atlantic Wind, LLC (Atlantic Wind) and Bethlehem Authority (Authority) (collectively, Appellants) appeal from the Carbon County Common Pleas Court's (trial court) May 29, 2020 order affirming the Penn Forest Township (Township) Zoning Hearing Board's (ZHB) January 30, 2019 decision that denied Atlantic Wind's special exception application (Application).  Appellants present three issues for this Court's review: (1) whether the ZHB erred by concluding that the Penn Forest Township Zoning Ordinance of 2011 (Ordinance) prohibited Atlantic Wind's proposed wind energy/wind turbine facility (Project)[1] as a second principal use; (2) whether the ZHB erred by concluding that Atlantic Wind failed to demonstrate compliance with the Ordinance's special exception standard relating to

---

[1]    [T]he process of wind energy is the process of converting energy from the wind into electricity.  And that happens whenever the wind flows across a wind turbine.  Modern wind turbines then turn to the wind, sense the speed of the wind and adjust the pitch of the blades accordingly.  That converts the kinetic energy of the wind into rotational energy of the blades which in turn turns a generator producing electrons that then flow out of the wind turbine through a local collector system and then into the grid.  And then the laws of physics dictate where those electrons will flow.

Reproduced Record (R.R.) at 951a-952a.  Section 202 of the Ordinance defines "wind turbine" as "a wind energy conversion system that converts wind energy into electricity through the use of a wind turbine generator, and includes the nacelle, wind rotor, tower, and pad transformer, if any." Ord. § 202 (R.R. at 255a).  A "wind rotor" consists of "the blades, plus the hub to which the blades are attached, that are used to capture wind for the purpose of energy conversion.  The wind rotor is mounted on a pole or tower or other suitable structure along with other generating and electrical equipment to form a [w]ind [t]urbine." *Id.*

the Project's noise level; and (3) whether the ZHB erred by concluding that a meteorological tower was not permitted by special exception and/or accessory use.[2] Upon review, this Court reverses in part, and vacates and remands in part.

The Authority is a City of Bethlehem municipal authority that owns property located along Hatchery Road (a/k/a Reservoir Road) in the Township, identified by the following tax parcel identification numbers: 52-51-A8 (149.83 acres), 37-51-A7 (244.11 acres), 24-51-A1 (1,061.64 acres), 25-51-A2 (425.40 acres), 38-51-A1.02 (39.76 acres), 37-51-A4 (287.60 acres), 38-51-A1.01 (204.71 acres), 24-51-A3.4 (666.82 acres), 37-51-A6 (381.50 acres), 25-51-A3 (503.51 acres), 37-51-A7.04 (14.21 acres), 37-51-A9 (54.25 acres), 37-51-A2 (25.39 acres), 37-51-A3 (30.49 acres), 37-51-A1 (376.26 acres), and 38-51-A4 (708.66 acres).[3, 4] *See* Reproduced Record (R.R.) at 54a-55a, 209a, 464a-465a, 1876a-1877a. Together, the parcels comprise approximately 5,000 acres (collectively, the Project Area). *See* R.R. at 203a, 435a, 936a. Most of the Project Area is located within the Township's Rural Residential (R-1) Zoning District, with the smaller balance of the Project Area located in the Township's Low Density Residential (R-2) Zoning District. *See* ZHB Dec. at 6 (R.R. at 53a). The Authority also maintains the Penn Forest and Wild Creek water reservoirs outside the Project Area, which supply the City of Bethlehem's drinking water. *See* ZHB Dec. at 11, Finding of Fact (FOF) 31 (R.R. at 57a).

---

[2] Despite properly citing in its brief that this Court's review is of the ZHB's decision, *see* Atlantic Wind Br. at 4, Atlantic Wind's Statement of Questions Involved challenged the propriety of the ZHB's decision *and the trial court's decision*. *See id*. at 5-6, 12-13. Because this Court's review is limited to the ZHB's decision, *see Friends of Lackawanna v. Dunmore Borough Zoning Hearing Bd.*, 186 A.3d 525 (Pa. Cmwlth. 2018), the issues have been rephrased accordingly.

[3] Parcel 38-51-A4 was not originally included in the Application, but was added during the hearing process after being properly advertised. *See* R.R. at 54a-55a, 1876a, 1977a, 1979a, 1981a.

[4] The Authority owns approximately 13,800 acres that span the Township in Carbon County and Polk Township, Monroe County. *See* R.R. at 436a. This appeal involves only the Authority's property in the Township.

3

On April 14, 2011, the Authority and The Nature Conservancy, a global non-profit environmental organization, entered into a 60-year Term Conservation Easement (Conservation Easement) covering certain of the Authority's real property in Carbon and Monroe counties, including the lots comprising the Project Area (Protected Property), *see* R.R. at 409a, 435a. The parties' intention in executing the Conservation Easement was to keep the Protected Property's "ecological, scientific, educational[,] and aesthetic value in its present state as a natural area which has not been subject to development or exploitation but is currently utilized for the production of potable water[.]" Conservation Easement at 1 (R.R. at 409a).

Section 1 of the Conservation Easement specified that its purpose was

> to ensure that the Protected Property will be retained predominantly in its natural, scenic, forested, and open space condition, free of additional forest fragmentation or additional development; to protect any rare plants, animals, or plant communities on the Protected Property; and to prevent any use of the Protected Property that will significantly impair or interfere with the conservation values or interests of the Protected Property described above. Specifically, this Conservation Easement will assure long-term, professional, independent third-party certified forest management on the Protected Property for the production, management and harvesting of economically valuable timber and related forest products while ensuring the conservation values as described above are protected or enhanced. This Conservation Easement will ensure the protection of forest and other natural resources on the Protected Property and allow for the potential of economic return from the protection, management, maintenance, and improvement of ecosystem services provided by the Protected Property.

Conservation Easement at 3 (R.R. at 411a).

Therein, the Authority agreed to

> confine the use of the Protected Property to such activities as are consistent with the purpose of th[e] Conservation Easement and shall specifically include [the Authority's]

4

right and ability to manage and operate the Protected Property in order to produce potable drinking water for the customers of [Bethlehem] City's water system.

*Id*. Section 3.9 of the Conservation Easement authorized the Authority "to enter into commercial wind development[,]" Conservation Easement at 10 (R.R. at 418a), as long as the Authority, *inter alia*, complied with permitting and approval requirements, and minimized community visual and sound impacts and disturbances to the large, continuous forest patches. *See id*. at 10-11 (R.R. at 418a-419a).

On March 6, 2013,[5] Atlantic Wind leased the Project Area from the Authority pursuant to a Wind Lease and Wind Energy Lease Agreement (Agreement). *See* R.R. at 436a-505a. In Section 3.1 of the Agreement, the Authority granted Atlantic Wind "the sole and exclusive rights[,] []in Atlantic[ Wind's] sole discretion, . . . to use the [Project Area] for wind energy purposes, and to convert all of the wind resources of the [Project Area,]" "provided that it is in accordance with the [] Conservation Easement . . . and the primary mission of the [Authority] to produce potable water[.]" Agreement at 3 (R.R. at 438a). In 2013 and 2015, Atlantic Wind filed and the ZHB approved conditional use applications to construct temporary commercial communication towers in the Project Area[6] that would measure and record wind at the site. *See* R.R. at 310a-316a, 370a, 677a-678a, 959a, 1056a-1057a. Thereafter, Atlantic Wind erected the towers.

On February 5, 2018, Atlantic Wind filed the Application, therein proposing 28 wind turbines with access roads and appurtenant structures and infrastructure integral to the Project's operation, including the permanent

---

[5] The Authority contacted Atlantic Wind in 2009 about developing the Project Area for wind energy. *See* R.R. at 952a-953a. They finally reached an agreement in 2013. *See* R.R. at 953a.

[6] One of the temporary towers is located on the lot identified by tax parcel identification number 37-51-A7, one is on lot 24-51-A1, and two are on lot 25-51-A2.

5

meteorological tower. *See* R.R. at 203a-226a. Specifically, Atlantic Wind requested:

> 1. Special [e]xception pursuant to Section[] 306.B.1 [of the Ordinance] to permit the proposed wind turbine use/wind energy conversion system (under the category of a miscellaneous use per the 306.B.1 Use Chart) in the R-1 Zoning District along with appurtenant infrastructure including but not limited to roads, permanent meteorological towers, electrical substations, overhead and underground electrical and data cables and transmission lines.
>
>> a. [Atlantic Wind] believes the permanent meteorological towers are permitted as part of the wind turbine use because the definition of wind turbine as set forth in Section 202 [of the Ordinance] includes towers[,] and because the permanent meteorological towers are an integral part of the use and necessary for the operation of the wind energy conversion system. In the alternative, [Atlantic Wind] seeks an interpretation from the Zoning Officer pursuant to Section 306.C.11 [of the Ordinance [sic][7]] that the permanent meteorological tower(s) are permitted as an accessory use or structure that is customary and incidental to the permitted wind turbine use and/or permitted as an accessory structure to the permitted wind turbine use pursuant to Section 402.A.54(n) [of the Ordinance[8]] which permits accessory electrical facilities.
>>
>> b. In the alternative, and without waiving the above interpretations, [Atlantic Wind] requests a special exception pursuant to Section 105.B [of the Ordinance[9]] to permit the permanent

---

[7] Ord. § 306.C.11.

[8] Ord. § 402.A.54(n).

[9] Ord. § 105.B, www.pennforesttownship.org/wp-content/uploads/2021/05/ZONING-BOOK-1.pdf (last visited Jan. 11, 2022).

In their briefs, the parties cite to Ordinance sections not included in the record. Other parts of the Ordinance not included in the record are dispositive of the issues before this Court. Section

6

> meteorological tower(s) as a use not specifically provided for (and not prohibited) in any of the zoning districts.
>
> 2. [Atlantic Wind] also seeks, to the extent applicable, any other variances, interpretations, and/or relief that the [ZHB] and/or Hearing Officer may ultimately deem necessary.

Appl. at 1-2 (R.R. at 209a-210a) (footnote omitted).

On February 23, 2018, the Township's Zoning Officer John DeCusatis (Zoning Officer) issued a memorandum to the ZHB, in which he opined that Atlantic Wind's proposed permanent meteorological tower was part of the overall Project. *See* R.R. at 286a-297a, 681a, 933a, 1199a, 1474a; *see also* Atlantic Wind Br. at 37 n.11.

The ZHB accepted evidence regarding Atlantic Wind's Application at its March 1, April 4 and 24, June 5, July 16, August 13, September 10, October 2 and 30, and December 17, 2018 meetings. By January 30, 2019 decision, the ZHB denied the Application, concluding, in relevant part:

> Atlantic Wind failed to meet its burden of establishing by creditable evidence that the [A]pplication complies with all applicable requirements of the [Ordinance,] since the proposed [Project] would constitute a second principal use within a residential district in violation of Section 802.B.2 of the [] Ordinance [(relating to numbers of principal uses)[10]] and the proposed permanent meteorological tower would not qualify as an accessory use or would be considered a second principal use within that residential district. Atlantic Wind failed to present evidence and failed to sustain its burden that the [Project] would comply with Section 402.A.54.p of the [] Ordinance [(relating to noise levels)[11]] . . . .

---

6107(a) of the Judicial Code declares that "[t]he ordinances of municipal corporations of this Commonwealth shall be judicially noticed." 42 Pa.C.S. § 6107(a).

[10] Ord. § 802.B.2.

[11] Ord. § 402.A.54.p.

7

ZHB Dec. at 20 (R.R. at 67a).

On February 28, 2019, Appellants separately appealed from the ZHB's decision to the trial court. The Penn Forest Board of Supervisors intervened in both appeals. On May 21, 2019, the trial court granted Atlantic Wind's and the Authority's unopposed joint motion to consolidate the appeals. On June 6, 2019, the trial court granted petitions to intervene filed by 42 property owners and J. William Fontaine, II (collectively, Objectors).[12] Without taking additional evidence, on May 29, 2020, the trial court affirmed the ZHB's denial of Atlantic Wind's Application, stating: "[T]he ZHB's findings of fact are supported by substantial evidence and [] the ZHB neither abused its discretion nor committed any error of law." Trial Ct. Op. at 7 (R.R. at 16a). Appellants appealed to this Court.[13]

The trial court ordered Appellants to file Concise Statements of the Errors Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure (Rule) 1925(b), *see* R.R. at 543a-544a, which they did. *See* R.R. at 545a-553a. On October 23, 2020, the trial court filed an opinion pursuant to Rule 1925(a) (1925(a) Opinion). *See* R.R. at 554a-562a.

---

[12] Due to Atlantic Wind's claim that Objectors' lacked standing based on their proximity to the Project Area, the trial court held a hearing solely on that issue. *See* Atlantic Wind Br. at 7 n.1.

[13] Appellate review of a decision of a zoning hearing board, where the trial court does not take any additional evidence, is limited to determining whether the [zoning hearing] board abused its discretion or committed an error of law. *Twp. of Exeter v. Zoning Hearing Bd. of Exeter Twp.*, . . . 962 A.2d 653 ([Pa.] 2009). An abuse of discretion occurs where the [zoning hearing] board's findings are not supported by substantial evidence. *Id.* Substantial evidence is such relevant evidence that a reasonable person would accept as adequate to support the conclusion reached. *Id.*

*Friends of Lackawanna*, 186 A.3d at 531 n.6.

8

## (1) Second Principal Use

Section 801.B.2 of the Ordinance states, in pertinent part: "**A lot** within a residential district **shall not include more than one principal use** . . . unless specifically permitted by this Ordinance." Ord. § 801.B.2 (R.R. at 277a) (emphasis added). Section 306.B.1.g of the Ordinance (Use Table, *Miscellaneous Uses*) lists *wind turbines* among the principal uses permitted in the Township's R-1 Zoning District by special exception.[14] *See* R.R. at 257a-258a; *see also* Ord. § 306.B.1.g.[15]

The ZHB concluded that "the proposed [Project] would constitute a second principal use within a residential district in violation of Section 802.B.2 of the [] Ordinance[,]" ZHB Dec. at 20 (R.R. at 67a), because the "Authority's current use of the proposed Project Area is a '[g]overnment [f]acility[],[']" ZHB Dec. at 14, Conclusion of Law (COL) 14 (R.R. at 61a), for "the production of potable water." *Id.*, COL 15. The ZHB relied on the Conservation Easement, the Agreement, and the following findings to reach that conclusion:

> 32. The Chairman of the [] Authority wrote to the Federal Energy Regulatory Commission [(FERC)] on February 25, 2015,[16] stating in pertinent part that "the [City of

---

[14] Because wind turbines are not permitted uses in the Township's R-2 Zoning District, they cannot be authorized by special exception. *See* Ord. § 306.B.1.g, www.pennforesttownship.org/wp-content/uploads/2021/05/ZONING-BOOK-2.pdf (last visited Jan. 11, 2022).

[15] *See* Ord. Use Table at 3-14, www.pennforesttownship.org/wp-content/uploads/2021/05/ZONING-BOOK-2.pdf (last visited Jan. 11, 2022).

[16] The Authority drafted the letter as a comment to be included in FERC's environmental impact statement regarding the route of the proposed PennEast Pipeline Project. *See* R.R. at 2210a. The ZHB declared:

> [Atlantic Wind] and the [] Authority cannot now take an alternative position and claim that the land located within the Project Area is simply vacant and can be utilized for the construction of twenty-four (24) wind turbines with pertinent structures and infrastructures including access roads, permanent meteorological towers, electrical

Bethlehem's] water comes entirely from surface sources and two (2) reservoirs in the Pocono Mountains. The two major components of the water supply system, which the Authority controls and has a duty to protect, are (i) the reservoirs holding the water, including the headwaters and streams feeding those reservoirs and (ii) the pipeline conveyance system that carries the water from the reservoirs to more than 115,000 customers." (Exhibit 0-13 and 7/23/[20]18 Tr. [a]t 82:8-25, 83:1-25 and 84:1-13).

33. In that same letter, the [] Authority stated:

> Protecting the [A]uthority's reservoirs necessarily requires protecting the surface waters feeding those reservoirs. To that end the [A]uthority not only owns the reservoirs, [but] it also owns the land containing the headwaters and the streams feeding the reservoirs. To protect the headwaters and feeder streams, the [A]uthority has placed significant portions of its land in a [C]onservation [E]asement.

ZHB Dec. at 10, FOFs 32-33 (R.R. at 57a); *see also* ZHB Dec. at 9-10, 17 (R.R. at 64a); February 25, 2015 Letter (R.R. at 2208a-2209a, 2210a-2212a).

> [T]he ZHB [] determined that since the main or dominant use of the [Project Area] is the production of potable water, the proposed use of the [Project Area] for twenty-four (24) wind turbines and accessory structures including the permanent meteorological tower whether as a principal use or accessory structure is precluded by the [Ordinance].

ZHB Dec. at 18 (R.R. at 65a).

---

> substation[s], overhead and underground electrical data cables, and transmission lines which obviously will result in significant disruption and alteration of the pristine lands which the [] Authority felt were so necessary to be maintained in that state that it entered into a [Conservation Easement].

ZHB Dec. at 18 (R.R. at 65a).

10

Appellants argue that the ZHB erred by denying the Application on that basis. Specifically, Appellants claim that, since the Project Area is currently vacant land with no existing use or activity, the Project cannot be a second principal use; in other words, deliberate nonuse is not a use regulated by the Ordinance. Appellants also assert that the Project Area is not *a lot* but, rather, a *collection of independent lots* with distinct tax parcel numbers which, in the absence of an authorizing Ordinance provision,[17] cannot be merged without express Township approval.

The law is well settled that "[w]here a word or phrase in a zoning ordinance is defined, a court is bound by the definition." *Slice of Life, LLC v. Hamilton Twp. Zoning Hearing Bd.*, 207 A.3d 886, 899 (Pa. 2019). In addition, while it is true that zoning ordinances are to be interpreted to allow the broadest possible land use, it is also true that their words must be construed by their plain and ordinary meanings. *See MarkWest Liberty Midstream & Res., LLC v. Cecil Twp. Zoning Hearing Bd.*, 102 A.3d 549 (Pa. Cmwlth. 2014) (*MarkWest I*).

In the instant matter, Section 102 of the Ordinance defines "use" as

> [t]he **purpose**, activity, occupation, business or operation **for which land** or a structure **is** designed, arranged, **intended**, occupied **or maintained**. Uses specifically include but are not limited to the following: activity within a structure, activity outside of a structure, any structure, recreational vehicle storage or parking of commercial vehicles on a lot.

Ord. § 102 (R.R. at 254a) (emphasis added). A "principal use" is defined as the "dominant use(s) or main use on a lot, as opposed to an accessory use."[18] *Id*. (R.R. at 249a). "Lot" is defined, in relevant part, as "[a] designated parcel, tract or area of land established by a plat or otherwise as permitted by law and to be used, developed

---

[17] Based on this Court's review of the Ordinance, the Township does not appear to have a merger of lots provision.

[18] An "accessory use" is "[a] use customarily incidental and subordinate to the principal use or building and located on the same lot with such principal use." Ord. § 102 (R.R. at 231a).

11

or built upon as a unit. A 'lot' shall be a lot of record held in single and separate ownership. . . ." *Id*. (R.R. at 244a). Accordingly, if the Authority's potable water protection is a dominant use on a lot in the Project Area, the ZHB had no choice but to deny the Application as to that lot pursuant to Section 801.B.2 of the Ordinance.

According to the Agreement, the Authority's primary mission is "to produce potable water[.]" Agreement at 3 (R.R. at 438a). The Conservation Easement also declared that it was intended to keep the Protected Property/Project Area's "ecological, scientific, educational[,] and aesthetic value in its [then-]present state as a natural area which has not been subject to development or exploitation but is currently utilized for the production of potable water[.]" Conservation Easement at 1 (R.R. at 409a). The Authority defended its purpose to FERC in 2015. Because the Authority, the Agreement, and the Conservation Easement reflect that the Authority's clear "purpose . . . for which [the Protected Property, that includes the Project Area] . . . [was] . . . intended . . . or maintained[,]" the Authority's potable water protection could, perhaps, be a *use*, as that term is defined in Section 102 of the Ordinance. Moreover, if it is a use contemplated by the Ordinance, and if it was the dominant use of the Project Area when Atlantic Wind filed the Application, the Authority's potable water protection use *could* be the Project Area's *principal use*. *Id*. (R.R. at 249a).

Further, while it is true that Section 801.B.2 of the Ordinance references "a lot," Ord. § 801.B.2 (R.R. at 277a), and the Township lacks authority to unilaterally merge the individual Project Area lots into a single lot in the absence of a merger of lots provision in the Ordinance, *see Loughran v. Valley View Devs., Inc.*, 145 A.3d 815 (Pa. Cmwlth. 2016), the fact that the Protected Property is comprised of individual lots does not govern this Court's analysis because the Protected Property covers all of the Project Area's individual lots. Thus, whether applying the Authority's potable water protection use to the Project Area's individual lots or as

12

an overlay to the larger Project Area, the result is the same - they are Protected Property subject to that use and, thus, Section 801.B.2 of the Ordinance would prohibit the Project as a second principal use on those lots.

The ZHB construed the Authority's potable water protection as a government facility use. *See* ZHB Dec. at 14, COL 14 (R.R. at 61a). This Court acknowledges that Section 306.B.1.d of the Ordinance (Table: *Uses Allowed in Each Zoning District* (Use Table), *Public/Semi-Public Uses*) lists "Government Facility" among the acceptable uses in the Township's R-1 and R-2 Zoning Districts.[19] Ord. § 306.B.1.d. Section 102 of the Ordinance defines "Government Facility, Other than Township-Owned" as:

> **A use owned by a** government, government agency[,] or **government authority for valid public health**, public safety, recycling collection[,] or similar governmental purpose, and which is not owned by [the] Township. This term shall not include uses listed separately in the [Use Table], such as 'publicly owned recreation.' This term shall not include a prison.

Ord. § 102 (R.R. at 241a) (emphasis added). Since the Authority owns the lots that make up the Project Area, which is subject to the Authority's protection of natural resources like potable water, such use *could conceivably* qualify as a government facility use.

---

[19] The Use Table specifically allows "[g]overnment facility, other than uses listed separately in [] Section 306 [of the Ordinance]," which include prisons/correctional institutions, publicly owned/operated recreation parks, public utility facilities, non-household swimming pools, United States Postal Service facilities, and water supply wells and related facilities, but does not expressly include Conservation Easements. *See* R.R. at 257a-258a; *see also* Ord. at 3-9 - 3-10, www.pennforesttownship.org/wp-content/uploads/2021/05/ZONING-BOOK-2.pdf (last visited Jan. 11, 2022). Although the ZHB could look to the Conservation Easement to ascertain the Authority's purpose, this Court has held that the protection of a private easement is not a zoning concern. *In re AMA/Am. Mktg. Ass'n, Inc.*, 142 A.3d 923 (Pa. Cmwlth. 2016); *see also* R.R. at 1601a, 1625a.

13

However, Section 306.B.1.d of the Ordinance clearly specifies that **a government facility is a** "[s]**pecial exception use** [**necessitating a**] **zoning decision by** [**the ZHB**]." Ord. § 306.B.1.d (emphasis added).[20]

> Generally speaking, '[**a** **special exception is** not an exception to a zoning ordinance, but rather **a use which is expressly permitted**, absent a showing of a detrimental effect on the community.' *Manor Healthcare Corp. v. Lower Moreland* [*Twp.*] *Zoning Hearing* [*Bd.*], . . . 590 A.2d 65, 70 ([Pa. Cmwlth.] 1991). In other words, as stated in our seminal decision in *Bray v. Zoning Board of Adjustment*, . . . 410 A.2d 909, 911 ([Pa. Cmwlth.] 1980)[:] 'The important characteristic of **a special exception is that it is a conditionally permitted use**, [and] legislatively **allowed if the** [**special exception**] **standards are met**.' This Court recently explained that an applicant for a special exception has both the duty of presenting evidence and the burden of persuading the [zoning hearing board] that the proposed use satisfies the objective requirements of the zoning ordinance for the grant of [a] special exception.
>
> *Tower Access Grp., LLC v. S. Union Twp. Zoning Hearing Bd.*, 192 A.3d 291, 300 (Pa. Cmwlth. 2018) . . . .

*Vineyard Oil & Gas Co. v. N. E. Twp. Zoning Hearing Bd.*, 215 A.3d 77, 85 (Pa. Cmwlth. 2019) (original emphasis omitted; emphasis added).

> Once the applicant meets these burdens, a presumption arises that the use is consistent with the health, safety and general welfare of the community. The burden then normally shifts to the objectors of the application to present evidence and persuade the [zoning hearing b]oard that the proposed use will have a generally detrimental effect.[21]

---

[20] www.pennforesttownship.org/wp-content/uploads/2021/05/ZONING-BOOK-2.pdf (last visited Jan. 11, 2022).

[21] "The burden that is placed upon the objectors requires more than mere speculation of possible harm." *In re: Thompson*, 896 A.2d 659, 679 (Pa. Cmwlth. 2006). Rather, the law requires

*MarkWest I*, 102 A.3d at 553 (quoting *Greaton Props. v. Lower Merion Twp.*, 796 A.2d 1038, 1045-46 (Pa. Cmwlth. 2002)).

Section 912.1 of the Pennsylvania Municipalities Planning Code (MPC)[22] provides, in pertinent part: "Where the governing body, in the zoning ordinance, has stated special exceptions to be granted or denied by the [zoning hearing] board pursuant to express standards and criteria, the [zoning hearing b]oard **shall hear and decide requests for such special exceptions** in accordance with such standards and criteria." 53 P.S. § 10912.1 (emphasis added). "'The function of the [zoning hearing] board . . . is to determine that such specific facts, circumstances and conditions exist which comply with the standards of the ordinance and merit the granting of the [special] exception.'" *EDF Renewable Energy v. Foster Twp. Zoning Hearing Bd.*, 150 A.3d 538, 545 (Pa. Cmwlth. 2016) (quoting *Broussard v. Zoning Bd. of Adjustment of Pittsburgh*, 831 A.2d 764, 769 (Pa. Cmwlth. 2003), *aff'd*, 907 A.2d 494 (Pa. 2006) (*Broussard II*)).

In the Township, Section 116 of the Ordinance governs special exception applications. *See* Ord. § 116; *see also* R.R. at 229a-230a, 259a, 275a-276a. Section 116.B of the Ordinance sets forth the ZHB's special exception procedure. *See* Ord. § 116.B (R.R. at 229a). Section 116.B.3 of the Ordinance specifies that "[t]he [ZHB] shall follow the procedures provided in Section 112 [of the Ordinance,]" Ord. § 116.B.3, which spells out the ZHB's procedures for hearings

---

that "objector[s] must prove to a high degree of probability that the impact from the proposed use will substantially affect the health, safety and welfare of the community to a greater extent than would be expected normally from that type of use." *Blancett-Maddock v. City of Pittsburgh Zoning Bd. of Adjustment*, 6 A.3d 595, 600 (Pa. Cmwlth. 2010). Moreover, this Court has consistently held that protection of neighborhood aesthetics and property values are insufficient bases upon which to deny special exceptions. *Wyomissing Area Sch. Dist. v. Zoning Hearing Bd. of Wyomissing Borough*, 128 A.3d 851 (Pa. Cmwlth. 2015).

[22] Act of July 31, 1968, P.L. 805, *as amended*, added by Section 91 of the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10912.1.

and decisions.  *See* Ord. § 112.[23]  In addition, Section 116.C of the Ordinance provides:

> Consideration of Special Exception Applications.  When special exceptions are allowed by this Ordinance, the [**ZHB**] **shall hear and decide requests for such special exceptions** in accordance with standards established by this Ordinance, including the following:
>
> 1. Compliance with this Ordinance.  **The applicant shall establish by credible evidence that the application complies with all applicable requirements of this Ordinance**.  The applicant shall provide the [ZHB] with sufficient plans, studies[,] or other data to demonstrate this compliance.
>
> 2. Compliance with Other Laws.  The approval may be conditioned upon the applicant later showing proof of compliance with other specific applicable Township, state and federal laws, regulations and permits.  Required permits or other proof of compliance may be required to be presented to the Township prior to the issuance of any zoning permit, building permit, certification of occupancy and/or recording of an approved plan.
>
> 3. Traffic.  The applicant shall establish that the traffic from the proposed use will be accommodated in a safe and efficient manner that will minimize hazards and congestion, after considering any improvements proposed to be made by the applicant as a condition on approval.
>
> 4. Site Planning.  The application shall include proper site layout, internal circulation, parking, buffering, and all other elements of proper design as specified in this Ordinance.
>
> 5. Neighborhood.  The proposed use shall not substantially change the character of any surrounding residential neighborhood, after considering any proposed conditions upon approval such as limits upon hours of operation.

---

[23] *See* www.pennforesttownship.org/wp-content/uploads/2021/05/ZONING-BOOK-1.pdf (last visited Jan. 11, 2022).

16

6. <u>Safety.</u>  The proposed use shall not create a significant hazard to the public health and safety, such as fire, toxic or explosive hazards.

7. <u>Natural Features.</u>  The proposed use shall be suitable for the site, considering the disturbance of steep slopes, mature woodland, wetlands, floodplains, springs[,] and other important natural features.

Ord. § 116.C (R.R. at 229a-230a) (emphasis added).  Accordingly, a special exception does not exist by operation of law but, rather, only by zoning hearing board *decision after a hearing* on a special exception application.

Although the ZHB's conclusions of law reflect the ZHB's understanding that the Ordinance permits a government facility use in the Project Area only by special exception, *see* ZHB Dec. at 14, COLs 11, 14 (R.R. at 61a), the ZHB did not make a finding that it had ever previously granted the Authority a special exception for such use in the Project Area.[24]

Since there is no record evidence that the ZHB granted a special exception for a government facility use in the Project Area pursuant to Section 116 of the Ordinance, as a matter of law, no valid government facility use existed in the Project Area.  *See Vineyard Oil & Gas Co.*; *see also* Ord. § 116.C.  Certainly, if a government facility use did not *exist*, it could not be a *principal* use.  If the Project Area was not already subject to a principal use when Atlantic Wind filed the Application, then the Project would be *the* principal use, rather than a prohibited *second* principal use.  The ZHB erred by denying the Application on the basis that the Project was prohibited as a second principal use.

---

[24] The Township's counsel represented to this Court at the November 13, 2021 oral argument that the ZHB has never previously received, reviewed, nor granted a special exception application for the Authority to conduct a government facility use in the proposed Project Area. The ZHB's conclusion in this case that the "Authority's current use of the proposed Project Area is a '[g]overnment [f]acility[],[']' which is permitted in both the R-1 and R-2 [Z]oning [D]istricts as a special exception[,]" ZHB Dec. at 14, COL 14 (R.R. at 61a), alone, is not a proper grant of a special exception.

17

This Court has explained: "A zoning [hearing] board has a duty to make essential findings of fact sufficient to support its conclusions." *Domeisen v. Zoning Hearing Bd. of O'Hara Twp.*, 814 A.2d 851, 860 (Pa. Cmwlth. 2003). Here, the ZHB made no findings of fact based on the record evidence which support its legal conclusions that the Authority's potable water protection is a *use* contemplated by the Ordinance, or that the Authority's potable water protection qualifies as a *valid government facility use* under Sections 102 and 306.B.1.d of the Ordinance. Accordingly, the ZHB's denial of a special exception on the basis that "the proposed [Project] would constitute a second principal use within a residential district in violation of Section 802.B.2 of the [] Ordinance[,]" ZHB Dec. at 20 (R.R. at 67a), is reversed.

### (2) Wind Turbines

Atlantic Wind next argues that the ZHB erred by concluding that Atlantic Wind failed to sustain its burden of proving that noise from the Project would not exceed the 45 decibel limit set forth in Section 402.A.54.p of the Ordinance. Specifically, Atlantic Wind claims that the ZHB disregarded unrefuted record evidence that Atlantic Wind can and will monitor and maintain the sound levels in accordance with any sound metric applied pursuant to the Ordinance. Atlantic Wind further contends that the ZHB's conclusion that the Ordinance mandates compliance with the Lmax sound metric was inconsistent with Section 402.A.54.f of the Ordinance requiring that wind energy facilities be constructed in accordance with all applicable wind energy and American National Standards Institute (ANSI) standards.

As stated above, wind turbines are among the principal uses permitted in the Township's R-1 Zoning District by special exception. *See* R.R. at 257a-258a; *see also* Ord. § 306.B.1.g. In addition to the general special exception criteria

18

required by Section 116 of the Ordinance, wind turbine applicants must satisfy the specific criteria set forth in Section 402.A.54 of the Ordinance, which specifies, in relevant part:

> f. The design of the [w]ind [e]nergy [f]acility shall conform to applicable industry standards, including those of [ANSI]. The Applicant shall submit certificates of design compliance obtained by the equipment manufacturers from Underwriters Laboratories, Det Norske Veritas, Germanishcer Llloyd [sic] Wind Energies, or other similar certifying organizations.
>
> . . . .
>
> p. The audible sound from the wind turbine(s) shall not exceed 45[]A weighted decibels [(dBAs)[25]], as measured at the exterior of a[n] occupied dwelling on another lot, unless a written waiver is provided by the owner of such building.

Ord. § 402.A.54 (R.R. at 275a-276a).

In the Application, Atlantic Wind addressed each of the general and specific special exception criteria listed in Sections 116 and 402.A.54 of the Ordinance. *See* R.R. at 203a-226a, 999a-1002a, 1061a, 1456a-1457a. Relative to the noise limitations in Section 402.A.54.p of the Ordinance, Atlantic Wind declared in the Application: "[Atlantic Wind] will comply with this requirement[,]" and it would provide proof thereof at the hearings. R.R. at 214a; *see also* R.R. at 995a-996a, 1004a-1005a.

---

[25] "Decibels is a volumetric scale or a volume scale in terms of sound level. . . . The higher the decibel level the higher the volume. The A-weighting is a representation of how the human ear generally responds to typical environmental sounds. It's the most common metric used in regulatory ordinances." R.R. at 1071a.

As a point of reference, "a normal conversation at three feet, if [a person is] not speaking loudly is 60 [dBAs]. Wind blowing through the trees might be 30 [dBAs, or i]t might be 40 [dBAs,] depending on how much wind is blowing." R.R. at 1102a-1103a; *see also Coal Gas Recovery, L.P. v. Franklin Twp. Zoning Hearing Bd.*, 944 A.2d 832, 836 (Pa. Cmwlth. 2008) ("[T]he 29 to 30 decibel range . . . is a normal background noise level for a rural area.").

19

At the Application hearings, professional acoustical engineer, Mark Bastasch (Bastasch), testified on Atlantic Wind's behalf that he conducted predictive modeling for the Project and issued his February 27, 2018 report, in which he concluded that the Project's sound levels will comply with Section 402.A.54.p of the Ordinance without the need of waivers. *See* R.R. at 227a-228a, 1072a, 1076a-1077a.

According to Bastasch, because the Ordinance did not specify the use of a particular metric to establish compliance with Section 402.A.54.p of the Ordinance, he employed the Leq metric, which he represented

> is the most common metric and the basis for the only standard available to assess wind turbine sound levels, [I]nternational Electrotechnical Commission (IEC) Standard 61400-11. Given this [O]rdinance [is] specific to wind energy facilities and the only standard available to assess wind turbine sound levels, IEC 61400-11, is based on the Leq metric, this assessment is necessarily based on the Leq metric.

R.R. at 278a; *see also* R.R. at 1087a-1088a. Bastasch described:

> We utilized the [Vestas 136 wind turbine model[26]] vendor's sound pressure level information that is specified in the . . . IEC 61400-11. That identifies the sound emissions coming from the turbine. We used the highest or the highest sound level noted in the vendor's documentation. We assume that all turbines were operating at that sound level.
>
> That was included into a propagation model that is based on [International Organization for Standardization (]ISO[)] 9613-2, which is the method for propagating sound outdoors. We used a ground co-efficient absorption of zero, which means we're not accounting for any

---

[26] However, Atlantic Wind has not determined the model of wind turbine it intends to use for the Project. *See* ZHB Dec. at 11, FOF 14 (R.R. at 58a).

> potential ground absorption. And we used a receptor height of four meters.

R.R. at 1073a; *see also* R.R. at 1074a, 1086a. Bastasch also relied on software that implements the ISO 9613 method (Cadna/A). *See* R.R. at 1074a.

Bastasch reported that his method also employed an omnidirectional downwind condition, meaning that

> the model predicts sound levels presuming that the receptor is downwind from all the sources simultaneously. So what that means is that if I'm sitting in the center of a source that's linear [sic]. So if we have a string of turbines here and I'm predicting the sound level at this point, the model is presuming the wind is coming this direction from that turbine, this direction from that turbine, and this direction from that turbine.
>
> Obviously, wind does not flow in that type of direction. But that is the basis of the modeling method that is used.

R.R. at 1074a-1075a. He declared that this method was evaluated and deemed reliable by the 2016 Massachusetts Clean Energy Center (MassCEC) study on wind turbine acoustics. *See* R.R. at 1075a.

Using this methodology, Bastasch determined that there are zero occupied dwellings at the 45 and 44 dBA sound levels, one at 43 dBA, six at 42 dBAs, 16 at 41 dBAs, and 8 at 40 dBAs. *See* R.R. at 280a, 1075a-1076a, 1086a. Accordingly, he concluded that "[t]he [] noise level that we're able to predict based on the available data and the typical data for a wind project using the vendor information and using the calculation means and methods for engineering and evaluations does not exceed 45 [dBAs]." R.R. at 1092a. Bastasch acknowledged that there is a plus or minus one error rate on his testing, but clarified that his prediction method was found in the MassCEC study not to underpredict sound levels. *See* R.R. at 1093a-1094a.

21

Bastasch explained that, if in the case of some anomalous event, such as ice on the wind turbine blades that causes the acoustics to change, Atlantic Wind has the ability to, and will ensure, adherence to the Ordinance's noise restrictions. *See* R.R. at 1077a-1079a, 1088a-1090a, 1098a. However, in his personal experience, when he has conducted compliance checks of a project, he has never found that the predictive model based on the Leq metric exceeded the noise restrictions. *See* R.R. at 1095a-1097a. Bastasch also reassured that, if turbine technology changes, or there are minor shifts in Atlantic Wind's layout, he could provide an updated evaluation. *See* R.R. at 1080a.

When asked if, in his opinion, it would be appropriate to analyze the 45 dBA Ordinance standard at a maximum speed limit using an Lmax metric, Bastasch responded:

> No. The L[m]ax approach is problematic for a number of reasons. Not the least of which is that it's not predictable. The vendors don't provide any data that would allow one to evaluate an L[m]ax criteria. It's not repeatable from one event to another event. It therefore has high variance. It's not considered reliable in that regard.

R.R. at 1079a.

Robert W. Rand (Rand) testified on Objectors' behalf as an expert in wind turbine acoustics and noise measurements.[27] *See* R.R. at 1725a. He explained that the Leq metric measures average sound levels, while Lmax measures the highest

---

[27] Objectors initially offered Rand as an expert in the field of acoustical engineering. Although he is a member of the Institute of Noise Control Engineering (INCE), he does not have an engineering degree, and he is not certified by INCE as an engineer. The parties ultimately accepted Rand as an expert in the field of wind turbine acoustics and noise measurements. *See* R.R. at 1710a-1724a.

According to the hearing transcripts, Rand appeared and testified before the ZHB, and the ZHB listed Rand's report and resume among Objectors' exhibit list; however, the ZHB made no findings of fact that Rand attended the hearing, that he offered testimony, or that the ZHB relied upon Rand's testimony to reach its conclusions.

noise level. *See* R.R. at 1728a, 1808a. Rand reviewed Bastasch's report and testimony and opined that the Leq metric is not a proper metric to evaluate a *shall not exceed* noise ordinance, since the average may report a number lower than the actual noise created by the source. *See* R.R. at 1728a-1729a, 1788a. Rather, based upon his experience, Rand opined that Lmax is the proper metric to assess the Project's noise level in the context of a *shall not exceed* ordinance. *See* R.R. at 1728a-1729a.

Rand reported that a nationwide survey of 491 noise ordinances reflected that only 8% of the municipalities directed the use of the Leq metric; thereby, implying the others used the Lmax metric. *See* R.R. at 1730a, 1732a. However, when asked whether Bastasch's statement that Leq is the industry standard applicable to the Project, Rand acknowledged: "[T]he wind industry uses Leq insofar as [it] obtain[s] Leq data from the manufacturers. There are undoubtedly other data that are available including maximum levels. What I've seen generally is [it] furnish[es] Leq data." R.R. at 1730a; *see also* R.R. at 1771a. Therefore, Rand agreed that Leq is the industry metric for predictive modeling for wind turbine sound. *See* R.R. at 1794a-1795a. Although Rand stated that the Lmax metric can be used for predictive modeling using the ISO 9613-2 with a conservative adjustment added to the Leq, because it was done in the MassCEC study, he has never seen it done other than in that study. *See* R.R. at 1793a-1795a, 1800a-1801a. Thus, he admitted that Lmax is primarily used for *measurement* of an existing source, as opposed to *modeling* a not-yet-existing source, and an accurate Lmax measurement would require an actual operating facility. *See* R.R. at 1821a-1822a, 1824a. Rand reported that he evaluated Bastasch's results, but did not conduct his own modeling. *See* R.R. at 1776a-1779a. Instead, he used the MassCEC numbers, which were obtained from hundreds of measurements taken from operating wind turbines. *See* R.R. at 1820a-1827a.

Rand refuted Bastasch's opinion that IEC 61400-11 is the only standard available to assess wind turbine sound levels. Rand described that IEC 61400-11 is the standard to be used in close-up test situations, but field testing should comply with ISO 1996-2 or ANSI standards 512.18 or 512.9. *See* R.R. at 1732a-1734a. However, Rand admitted that IEC 61400-11 is the international standard required to be used, and, in his experience, has been used to obtain sound power levels for wind turbines, and the "data are Leq." R.R. at 1771a; *see also* R.R. at 1770a, 1772a-1773a.

Rand also asserted that Bastasch failed to disclose the inconsistencies in the ISO 9613-2 standard, which is a three degree variability. *See* R.R. at 1741a. He also claimed that, if Bastasch incorporated a two degree variability, Bastasch failed to mention it in his February 27, 2018 report. *See* R.R. at 1782a-1788a. Rand further disputed that there is any support in the ISO 9613-2 for claiming that the Project's noise level will never exceed the predicted levels, because the standard itself warns that results may vary at any site on any given day, and it did not appear to Rand that Bastasch accounted for that discrepancy. *See* R.R. at 1742a-1744a. Rand explained that, since the Leq metric is based on an average (i.e., some noise levels are higher and some are lower), unless the noise level is flat and never changes (which is not the case with wind turbines), some noise levels *will* exceed the Ordinance's 45 dBA limit. *See* R.R. at 1744a-1745a.

Rand also pointed out that Bastasch cast doubt on his own conclusions by saying that sound mitigating measures can be put in place if noise levels ever do exceed the Ordinance's 45 dBA limit, but agreed that Atlantic Wind has control, and could shut down any offending wind turbines if/when necessary. *See* R.R. at 1752a-1756a, 1797a-1800a. Rand further represented that, as a member of the Institute of Noise Control Engineers, if Bastasch knows that the Project noise levels would exceed known thresholds and, perhaps, disturb sleep, etc., he is obligated to notify

24

the relevant authorities. *See* R.R. at 1756a, 1758a-1759a. However, Rand admitted that Bastasch employed reasonable variables, since one way he could have represented a lower decibel level to the ZHB was to use a higher ground attenuation score or to use less conservative atmospheric conditions, and Bastasch did not do so. *See* R.R. at 1780a-1781a.

Finally, Rand described that obtaining the Lmax metric for wind turbines is difficult but not impossible, and the MassCEC study measured the Lmax metric levels higher than the Leq metric, and supports that, to reach a conservative Lmax metric, one need only add 11 dBAs to a Leq result (ex., if the Leq metric shows 40 dBAs, the Lmax metric would be 51 dBAs). *See* R.R. at 1738a-1741a, 1747a-1750a, 1766a-1769a, 1810a-1813a, 1815a. Applying that method to this case, Rand declared "the [Ordinance noise levels] would be exceeded at all the neighbors[' residences]." R.R. at 1727a. He acknowledged, however, that the MassCEC study referenced empaneling a commission to find a more reliable method of calculating turbine sound other than the Lmax metric because of Lmax's apparent unreliability. *See* R.R. at 1813a-1815a. Rand described that, when measuring a noise source, a consultant must be sure he is measuring the wind turbine source, not other noise sources, which adding 11 to obtain the Lmax metric conservatively allows for such variance. *See* R.R. at 1806a-1809a, 1816a-1818a.

Regarding which metric application must be applied to determine compliance with Section 402.A.54.p of the Ordinance, Rand declared:

> It doesn't say Lmax in the [O]rdinance. What I'm providing is an opinion, professional opinion, that if you are to go out and measure a noise which had been permitted -- and I'm not saying what equipment may have been permitted, any equipment -- you hold up a meter and you're evaluating against [sic] shall not exceed, you have to look at the Lmax.
>
> . . . .

25

> . . . If you look at Leq and Lmax, Leq clearly will not provide the range of sound levels needed to assess against shall not exceed. Leq could be any number of decibels below the Lmax. And in the case of Michigan and the testimony and data provided from the [Mass]CEC study, the Lmax can be as high as 11 dBA over the Leq. So you have to use Lmax.

R.R. at 1819a-1820a. Rand testified that all of his opinions were rendered with a reasonable degree of scientific certainty. *See* R.R. at 1764a.

Atlantic Wind also presented certified noise control engineer, Robert D. O'Neal (O'Neal), on rebuttal. *See* R.R. at 320a-325a, 756a-904a. O'Neal reviewed Section 402.54.A.p of the Ordinance, Bastasch's and Rand's testimony, and Bastasch's February 27, 2018 report. O'Neal observed that Section 402.54.A.p of the Ordinance specifies that the Township's wind turbine sound limit is 45 dBAs, but does not state a particular metric by which the sound limit must be measured. *See* R.R. at 772a-773a, 833a. O'Neal described that acoustics experts like himself will "read [an ordinance] like this that does not specify what the metric is, . . . [and] would use [their] professional experience in terms of what [they]'re evaluating. So for a wind turbine [they will] evaluate it . . . with respect to the equivalent sound level or the Leq."[28] R.R. at 774a-775a.

> O'Neal confirmed:
>
> Leq is what's called the equivalent sound level. And the equivalent sound level is a sound level over a defined period of time. It could be one minute, could be one hour, it could be five hours. So over a defined period of time. And it's a one number equivalent.
>
> It takes all the energy through that time period[] and makes a one number equivalent of it. And that energy is heavily skewed by higher events during that time period. It's not

---

[28] O'Neal testified that in a study across 491 United States communities, 8% of their ordinances expressly require the use of the Leq metric. *See* R.R. at 861a. The remaining communities, like the Township, did not specify the metric to be applied. *See id.*

26

> immediate.  It's not an average.  It takes all the energy
> during that time period.  That's a[] Leq.

R.R. at 775a-776a; *see also* R.R. at 835a.  O'Neal explained that the Leq metric "takes all the energy and gives you one number of that sound level . . . ,"[29, 30] R.R. at 835a, while the Lmax metric will test the maximum instantaneous sound level during any given time period, which is generally a spike.  *See* R.R. at 777a, 835a, 849a-850a.  Thus, traffic, turning on an air conditioner, slamming a car door, or "any little gust of wind that is not related to operation of a wind turbine will cause a spike in the sound level and now that will be your Lmax even though it's not from the wind turbine."  R.R. at 850a; *see also* R.R. at 867a, 887a.  He added: "When turbines are operating, they're operating at a fairly steady -- steady pitch.  They're not going to generate spikes."  R.R. at 899a.

> O'Neal expounded:
>
> The Leq [metric] is by far the most often used metric in the field of acoustics.  There are many applications for it.  Wind energy is just one of many.  The Lmax [metric] would be and is used in certain applications absolutely.  But it's more used for things like pile driving or, you know, construction noise.  A short duration type of event[] that ha[s] a loud short duration sound level.

R.R. at 777a-778a.

> When asked why the Leq metric was the appropriate metric for a sound measurement of wind turbines, O'Neal declared:
>
> The Leq [metric] is the sound metric that every wind turbine manufacturer uses by international standard to measure the sound from the turbines to get the rating of [its] turbines.  It's like rating a light bulb.  The [manufacturers] rate their sound power using a defined IEC 61400-11 standard.  It's an international standard used

---

[29] The Leq metric can be used to model or measure sound.  *See* R.R. at 902a.

[30] Bastasch's calculations assumed all 24 of the turbines "[we]re operating at their absolute highest performance or maximum sound levels simultaneously."  R.R. at 903a.

27

for this particular source of sound. And other sources of sound have other standards too. This is the one that's particular to a wind energy -- a wind turbine.

R.R. at 778a; *see also* R.R. at 827a. He added that the 2016 MassCEC study revealed that the Lmax metric was the least reliable way to measure wind turbine sound, due to a number of factors, including that the Lmax metric is an instantaneous number from which background noise cannot be subtracted, whereas with the Leq metric, background noise can be mathematically subtracted, so there is a higher degree of confidence with the Leq metric that the sound was only from the turbine. *See* R.R. at 806a-808a, 862a-863a.

Although O'Neal acknowledged that it is not *impossible* to measure wind turbine noise using the Lmax metric, *see* R.R. at 850a-851a, 890a-891a, he stated that all wind turbine sound modeling is performed using the Leq standard "because that is the very detailed, very high level data that comes out of the IEC 61400-11 international standard for measuring wind turbines that uses the Leq measurement process to measure the data." R.R. at 781a; *see also* R.R. at 866a.

O'Neal described that IEC 61400-11 international standard data

is collected under direct measurements of a turbine. And it's done at a prescribed distance. Generally, it's the height of the nacelle and half the rotor diameter of the particular turbine that's under measurement.

So it's in the neighborhood of 400, 450 feet away so that you know you're measuring just that particular wind turbine. It's measured under a variety of different wind speeds. And, again, at some point under certain wind speeds you see the sound level data flatten out. It does not get any louder than that.

So there's a maximum or highest sound level from that particular turbine. And that data under a variety of wind speeds is what is provided out of the IEC standard to a developer who shares it with their acoustical engineer.

28

R.R. at 792a.

O'Neal refuted Rand's position that the measurements are taken at optimum levels, stating that measurements are taken with the turbine running and also while it is off, to get the background sound level. Then, the background sound is subtracted from the total sound resulting in a turbine-only number, which is the number used in modeling. *See* R.R. at 794a, 892a-893a. He explained that the IEC 61400-11 includes data particular to each and every wind turbine brand and model, including the Vestas used in Bastasch's modeling, collected using the Leq metric because it is the most reliable, stable, repeatable metric. *See* R.R. at 792a-796a, 827a.

O'Neal declared that the IEC 61400-11 international standard is the absolute standard, with by far the best data available to the acoustics industry for predictive wind turbine sound modeling, because the data is collected in the real world. *See* R.R. at 793a, 827a, 866a. O'Neal expressed that the IEC 61400-11 international standard and even the alternative ANSI 512.9 part 3 and ANSI 512.18 standards that Rand referenced "all use the Leq [metric] to describe sound." R.R. at 797a. He represented that he has never been involved in a wind turbine modeling analysis that did not employ the IEC standard. *See* R.R. at 793a.

O'Neal also stated that, although the Ordinance does not require sound level modeling, Bastasch used that process to reach his conclusions as a matter of due diligence. *See* R.R. at 781a, 825a-826a. O'Neal described Bastasch's process as follows:

> It's a multi-stepped process. You need to start with the layout. In other words, what does the project look like, where the turbine is going to be located. So you get a turbine layout from the applicant or the developer that has the latitude and longitude coordinates of the sound sources, the wind turbines, in this case.

29

Then you get sound level data from the wind turbines. That sound level data comes [from] using this IEC 61400-11 international standard. The key takeaway for the standard is that this standard[] measures the turbines out in the real world under a wide variety of wind speed conditions.

And under lower wind speed conditions they make less sound. Under higher wind speed conditions they make more sound. And if they reach a certain wind speed where they don't make any more sound, the blades feather, and the sound level from the turbines does not increase any more.

And that maximum sound level from the turbines at whatever wind speed that is for the turbine that's being evaluated, the V-136 in this case[,] [t]hat is the sound level that [] Bastasch put into the model. It was the highest sound level under whatever wind speed generates that sound.

So you have the turbines, you know where they're located, you know how much sound, the highest sound level they can give out is, you get the coordinates of homes in the community. Put that into your model. You put terrain. Topography into the model from [the United States Geological Survey] or the state database. You put temperature. The relative humidity into the model. Those factors are generally 10 degrees C, 70 percent relative humidity. Those are conservative. Those generate the least amount of sound reduction. So they give you the highest potential sound levels. And you put a ground factor in, a G-factor, indicating hard ground, intermediate ground, a combination of hard and soft, or soft ground.

And [] Bastasch put a G-factor of zero [] which is hard ground, which, again, is the most conservative, and will give you the highest possible sound levels in his modeling.

R.R. at 782a-784a; *see also* R.R. at 799a-801a. After having visited the Project Area, O'Neal agreed with Bastasch's conservative assumptions. *See* R.R. at 810a-811a. He also stated that Bastasch's ISO 9613 modeling standard comports with the same ANSI standard model with a different number. *See* R.R. at 789a.

30

According to O'Neal, the next step is to input the turbine, community, and topography lay-out, and "use a standard to [] propagate or calculate from each of the wind turbines out into the community. And that's the ISO 9613-2 standard . . . ." R.R. at 798a. O'Neal described that the ISO-9613 standard is a worst case standard in which "the wind is assumed to be blowing from every source to every receptor at the same time regardless of actual directionality[,]" and which makes its predictions fairly conservative. R.R. at 802a. O'Neal described that Bastasch's model result was not an arithmetic average, but the highest possible sound level for the Project. *See* R.R. at 836a, 847a-848a, 900a-901a.

O'Neal reviewed Rand's suggestion in the MassCEC study that the Lmax construction measurement ranges from 6 to 11 dBAs higher than the Leq metric because of background noise contamination, s*ee* R.R. at 841a-846a, but offered that Rand's adding of 11 dBAs to Bastasch's results was not consistent with any accepted industry acoustic standards for modeling sound, because "[t]here's no ANSI standard that talks about making that kind of an adjustment from [a] [metric] Leq to an Lmax [metric]." R.R. at 790a; *see also* R.R. at 866a.

O'Neal agreed with Bastasch's conclusion that the actual Project noise will not exceed the 45 dBAs

> because, by doing such a short time period[31] and using the conservative assumptions that [] Bastasch did he's basing that conclusion on looking at his modeling approach and his techniques with the [2016] [Mass]CEC research study . . . . And one of the conclusions of that report is[,] with those types of settings[,] the measured values in Massachusetts of a variety of turbines never exceed[ed] the model values of those same turbines when

---

[31] Although O'Neal inferred that it was five minutes because that was the time in the report to which Bastasch compared his modeling in this case, the record is not clear as to how long Bastasch conducted the modeling. *See* R.R. at 822a-824a, 848a, 864a-865a, 895a-896a.

31

using switches such as [] Bastasch used here with a G of zero and so forth.

R.R. at 804a.

O'Neal declared that Atlantic Wind's control over the wind turbines plays a role in his conclusion "[b]ecause . . . if, for whatever reason, a sound level did not meet a 45 [dBA] limit, I'm not saying it would, but if for some reason, it didn't, the operator . . . can regulate [the turbines] . . . [to] meet it."[32]  R.R. at 804a-805a.  O'Neal explained:

> Every wind operator has a central control center that's staffed 24 hours a day where there are staff people watching each turbine.  Every turbine at every wind farm is monitored 24 hours a day.  And, so, if there is something going on at a wind turbine they know it.  If there is a requirement to do something at a certain wind farm, they can program it accordingly and take action to make that turbine do whatever is required.

R.R. at 811a.  O'Neal stated that, although Rand considered an operator's ability to control the wind turbines' sound in his report, Rand discounted it as ineffective.  *See* R.R. at 790a-791a.

O'Neal concluded with a reasonable degree of professional certainty that Bastasch's modeling accurately demonstrated that Atlantic Wind has the ability to comply with and not to exceed the 45 dBA Ordinance standard, and that the Project sound levels will not exceed 45 dBAs at any identified occupied dwelling.  *See* R.R. at 761a, 815a-816a, 853a.

"The [ZHB] is the arbiter of credibility and weight to be afforded the evidence and [courts] may not engage in factfinding or disturb the [ZHB's] credibility determinations on appeal."  *Allen Distrib. v. W. Pennsboro Twp. Zoning*

---

[32] For example, O'Neal expressed that damage and ice build-up on the blades to a certain degree can change a wind turbine's acoustical characteristics, although not necessarily to the point of exceeding the Ordinance limit.  *See* R.R. at 818a-819a, 853a-857a.

*Hearing Bd.*, 231 A.3d 90, 102 (Pa. Cmwlth. 2020). Accordingly, this Court acknowledges that "[a] zoning [hearing] board is free to reject even uncontradicted testimony it finds lacking in credibility, including testimony offered by an expert witness[,] [and] [i]t does not abuse its discretion by choosing to believe the opinion of one expert over that offered by another." *Taliaferro v. Darby Twp. Zoning Hearing Bd.*, 873 A.2d 807, 811 (Pa. Cmwlth. 2005) (citations omitted). However, the zoning hearing board must "provide[] an adequate explanation of its resolution of the factual questions involved, and set[] forth its reasoning in such a way as to show its decision was reasoned and not arbitrary." *Id.* at 816.

In the instant matter, without making any specific credibility determinations, the ZHB made the following relevant findings of fact:

42. No testimony was presented to the ZHB as to how much sound would be generated by the actual wind turbines [Atlantic Wind] would actually or eventually use.

. . . .

46. In modeling the sound level, [] Bastas[c]h used the "Leq metric[].["]

47. The Leq metric averages sound over a period of time.

48. [The] Lmax [metric] measures the "highest sound level" during any given time period.

49. The wind industry standard [] Bastasch used for modeling the sound level generated by the wind turbines is the ISO 9613-2.

50. To a large extent, the manufactures [sic] of wind turbines dictate that the purchasers of wind turbines use the Leq metric by providing sound data to purchasers of wind turbines using only the Leq metric.

51. The time period over which the Leq metric average is calculated could be anywhere from a few seconds to weeks, months, or even years.

33

52. It was unclear the length of the period [] Bastasch used in making his calculations and rendering his opinions.

53. Although the Lmax method is not the wind industry standard for measuring sound generated by wind turbines, and it can be difficult to get an accurate measurement, it can be used, and has been used, for that purpose.

54. The measurement of decibels is logarithmic in nature, and not linear.

55. The variance using the IOS 9613-2 standard is ± three (3) decibels.

55. [sic] [Ordinance] Section 402.A.54[.]p[] specifically states "shall not exceed forty-five (45) weighted decibels, as measurement at the exterior of an occupied dwelling on another lot unless a written waiver is provided by the owner of such property" and as such is a shall not exceed standard.

56. [sic] The appropriate metric to use when evaluating a *shall not exceed* noise ordinance is the Lmax, which measures the highest level of sound. [The] Leq [metric] measures the average sound level.

57. [sic] The Lmax metric is commonly used in regard to a *shall not exceed* ordinance.

58. [sic] A reasonable "rule of thumb" to convert a sound level using the Leq metric to a sound level using the Lmax method is to add eleven (11) decibels to the Leq measurement.

ZHB Dec. at 11-12, FOFs 39-58 (R.R. at 58a-59a) (italics added).

The ZHB reached the following conclusions of law:

24. Atlantic Wind failed to supply information necessary to demonstrate compliance with the standards and criteria of Section 402.A.54.p [of the Ordinance].

25. The testimony presented by Atlantic Wind relating to an average project sound level not exceeding a forty-five (45) dBA [limit] at any identified occupied dwelling is insufficient to meet the requirements of 402.A.54.p of the [Ordinance].

34

26. The [Ordinance] does not provide for an averaging of noise admissions[,] but rather specifies that an average noise level shall not be exceeded.

ZHB Dec. at 15, COL 24-26 (R.R. at 62a).

The ZHB explained:

[Atlantic Wind] failed to produce evidence to meet its burden that the sound level would not exceed the requirements of the [Ordinance].

The specific language of Section 402.A.54.p [of the Ordinance] provides that the audible sound shall not exceed 45A weighted decibels as measured at the exterior of an occupied dwelling on another lot. In an effort to meet its burden [Atlantic Wind] presented the testimony of [] Basta[s]ch, . . . who predicted the sound levels would comply with the [Ordinance]. No evidence was presented of the exact type of wind turbine which would be utilized in the Project Area and as such which would include the level noise emission from that particular type of turbine. Moreover, the predicted sound levels by [Atlantic Wind's] expert were based on a sound modeling using a L[eq] average level of noise. The L[eq] metric averages sound over a period of time which[,] by its definition[,] would include levels that exceed the 45A weighted decibels and those below that level. No testimony was presented as [to] the length of time upon which that average sound period would be measured nor does the [Ordinance] specify the amount of time. If the [Ordinance] contemplated using the L[eq] method it would have specifically listed it or [i]n the alternative [] included the period of time upon which the average was to be calculated.

Clearly the language of the [Ordinance] using [sic] a "shall not exceed" standard in the Ordinance. A type of sound acoustic measurement called the Lmax measures the instantons maximum sound level during any given time. Although testimony revealed that the Lmax method is not the wind industry standard for measuring sound generated by wind turbines, because it can be difficult to get an accurate measurement, it can be used and has been used

35

for that purpose. Despite the fact that [Atlantic Wind] presented testimony that wind turbines could be shut down or turned off during periods of high winds to prevent the sound levels from exceeding the 45A weighted decibels, this is not "evidence" of the fact that the wind turbines would not exceed the 45[]A weighted decibels at the exterior of an occupied building. Evidence is not "a promise" that the applicant will comply because that is a legal conclusion reserved for the [ZHB] once it hears what the applicant intends to do and then determine[s] whether it matches the requirement set forth in the ordinance. *Edgemont* [*sic*] *Twp. v. Springton Lake Montessori Sch*[*., Inc.*] . . . , 622 A.2d 418 (Pa. Cmwlth. 1993). The [ZHB] has determined that insufficient evidence was presented by [Atlantic Wind] as to turbine sound to be emitted from the turbine[,] which model number was never indicated by [Atlantic Wind,] by which to determine that the sound emanating from the [P]roject would not exceed 45A weighted decibels at the exterior of a property to show compliance with Section 402.A.54.B [*sic*] of the [] Ordinance.

ZHB Dec. at 19-20 (R.R. at 66a-67a).

Section 112.C.2 of the Ordinance specifies: "Where the application is contested or denied, the [ZHB's] decision shall be accompanied by findings of fact and conclusions based thereon, **together with the reasons for such conclusions**." Ord. § 112.C.2 (emphasis added).[33] This Court has also ruled: "Appellate courts cannot properly and efficiently exercise even a limited function of judicial review without the [ZHB's] necessary findings of fact and conclusions of law **together with reasons for its decision**, **even when the record contains complete testimony presented to the** [**ZHB**]." *Upper Saucon Twp. v. Zoning Hearing Bd. of Upper Saucon Twp.*, 583 A.2d 45, 48 (Pa. Cmwlth. 1990) (emphasis added).

---

[33]     www.pennforesttownship.org/wp-content/uploads/2021/05/ZONING-BOOK-1.pdf (last visited Jan. 11, 2022).

36

Here, although it appears that Rand's testimony formed the basis of the ZHB's decision, the ZHB never made a finding that Rand appeared or even testified at the ZHB hearings,[34] let alone reconciled Rand's testimony with Bastasch's testimony. The ZHB did not make any findings relative to O'Neal's testimony, or reconcile his conclusions with Rand's statements, nor did the ZHB make a determination that it found Rand's testimony more credible than Bastasch's and O'Neal's testimony. Accordingly, the ZHB did not provide any "explanation of its resolution of the factual questions involved[.]" *Taliaferro*, 873 A.2d at 816.

Moreover, as a substantive matter, despite that Section 402.A.54.p of the Ordinance does not specify which metric, Leq or Lmax, should be used to determine whether the 45 dBA restriction therein will be met, and even after acknowledging that the Lmax metric *is not* the wind industry standard for measuring sound generated by wind turbines, the ZHB ruled that Atlantic Wind's modeling should have been done based on the Lmax metric. The ZHB highlighted that, "[i]f the [Ordinance] contemplated using the L[eq] method it would have specifically listed it or [i]n the alternative [] included the period of time upon which the average was to be calculated." ZHB Dec. at 19 (R.R. at 66a). The contrary is also true: If the Ordinance intended for applicants to apply the Lmax metric, it could have stated so therein, and/or specified a time over which a Leq metric should be calculated. However, Section 402.A.54.p of the Ordinance is silent on both points. This Court has held that, when a zoning ordinance does not contain the requirement the zoning hearing board ascribes to it, the zoning hearing board's conclusion has no basis in law or fact and, thus, cannot stand. *See MarkWest I.*

> [T]he Pennsylvania Supreme Court has made clear that
> "the authority of a zoning [hearing] board to act arises

---

[34] Rand's name only appears in the ZHB's decision insofar as his report and resume are listed among Objectors' exhibits. *See* ZHB Dec. at 4 (R.R. at 51a).

37

exclusively from the ordinance and the enabling statute and the language of both demarcates [its] jurisdiction . . . . *Norate Corp. v. Zoning Bd. of Adjustment of Upper Moreland Twp.*, . . . 207 A.2d 890, 893-94 ([Pa.]1965).

> [**A**] **zoning** [**hearing**] **board** is not a legislative body, and it **lacks authority to modify or amend the terms of a zoning ordinance**. '[Z]oning [hearing] boards . . . must not impose their concept of what the zoning ordinance should be, but rather their function is only to enforce the zoning ordinance in accordance with the applicable law.' Thus, the [zoning hearing] [b]**oard is required to apply the terms of the** [z]**oning** [o]**rdinance as written** rather than deviating from those terms based on an unexpressed policy.

> *Greth Dev. Grp., Inc. v. Zoning Hearing Bd. of Lower Heidelberg Twp.*, 918 A.2d 181, 187 (Pa. Cmwlth. 2007) (citation omitted; emphasis added) (quoting *Ludwig v. Zoning Hearing Bd. of Earl Twp.*, 658 A.2d 836, 838 (Pa. Cmwlth. 1995)); *see also MarkWest I.* "**A zoning hearing board does not enjoy broad**, **inchoate powers to advance its members**' **vision of what constitutes the public welfare** or even the public welfare as defined in a variety of environmental protection statutes, be they state or federal. Other governmental agencies bear that enforcement authority." *HHI* [*Trucking & Supply, Inc. v. Borough Council of Borough of Oakmont*], 990 A.2d [152,] 160 [(Pa. Cmwlth. 2010)] (emphasis added).

*MarkWest Liberty Midstream & Res., LLC v. Cecil Twp. Zoning Hearing Bd.*, 184 A.3d 1048, 1060 (Pa. Cmwlth. 2018).

> Although the [ZHB's] interpretation of the [Ordinance] is entitled to deference, based upon this record[,] we conclude that the [ZHB] acted arbitrarily and abused its discretion by mandating [noise metric] requirements not set forth in the [Ordinance]. Because the [ZHB's] [c]onclusions are not supported by the law or [satisfactory weighing of] the record evidence, they cannot form the basis for the [ZHB's] denial of [Atlantic Wind's] special exception [A]pplication.

*MarkWest I*, 102 A.3d at 564.

The ZHB's failure to make necessary findings of fact and credibility determinations regarding the expert witness testimony, and its undocumented policy and unsupported position that Section 402.A.54.p of the Ordinance requires applicants to prove a proposed wind energy project's compliance therewith using *only* the Lmax metric (which all the experts agreed is *not* a wind industry standard), reflect that the ZHB did not have a basis in the Ordinance to deny the Application.

In addition, the ZHB's reliance on *Edgmont* to support its position that Atlantic Wind's promise to operate within the noise restrictions in Section 402.A.54.p of the Ordinance is insufficient to meet its burden relative to the Application appears to be misplaced. This Court acknowledges that a promise of future compliance alone is not sufficient for an applicant to satisfy special exception requirements. *See Edgmont*. However, in *Edgmont*, this Court reversed the zoning hearing board's grant of a special exception where the applicant failed to address the special exception criteria but, instead, assured the zoning hearing board that it would comply with those criteria. *See id*. This Court concluded that if the application submission did not address all of the special exception criteria, promises cannot make up for the shortfall, and the application must be denied.

However,

> [**w**]**here the plan**, **as submitted**, addresses all of the ordinance's prerequisites for the special exception sought, and **reasonably shows that the property owner is able to fulfill them in accordance with the procedures set forth by the zoning code** (**as reasonably interpreted by the** [**zoning hearing**] **board**), a reviewing court should not reverse the grant of such an exception on the sole basis that some of the items described in the plan [are promised to] be completed at a later date.

*Broussard II*, 907 A.2d at 502 (emphasis added). In such situations, an applicant's promise of future compliance with the ordinance may satisfy the applicant's initial burden of persuasion. *See id.* Therefore, here, where Atlantic Wind specifically addressed in its Application and at the hearings *all* of the Township's special exception criteria, where Section 402.A.54.p of the Ordinance does not specify that expert acoustics testimony is necessary to satisfy that requirement or that the Lmax metric is the governing metric, and where the ZHB has not properly weighed evidence such that this Court can determine whether the ZHB *reasonably* interpreted the Ordinance's noise restriction, *Edgmont* is not controlling.

"The extent of the [ZHB's] error [denying the Application] without supportive findings of fact requires us to remand this part of the [ZHB's] decision with the directive that the [ZHB] make findings on this issue." *Domeisen*, 814 A.2d at 860. Accordingly, the portion of the trial court's order affirming the ZHB's conclusion that Atlantic Wind's wind turbines did not meet the criteria for a special exception must be vacated and the matter remanded for the ZHB to make credibility determinations and explain its resolution of the factual questions surrounding its noise metric requirement and make conclusions of law based thereon.

### (3) Meteorological Tower

Atlantic Wind also argues that the ZHB erred by concluding that Atlantic Wind's proposed permanent meteorological tower would not qualify as an accessory use, or it would be considered an unpermitted second principal use, within a Township residential district, because the Zoning Officer concluded that it was an integral part of the overall Project.

Section 116.B.2 of the Ordinance specifies that, as part of the ZHB's special exception procedure, "[t]he Zoning Officer should provide a review to the [ZHB] regarding the compliance of [an] application with th[e] Ordinance." Ord. §

40

116.B.2 (R.R. at 229a). Section 202 of the Ordinance defines "wind turbine" to "**include the** nacelle, wind rotor, **tower**, and pad transformer, if any." Ord. § 202 (R.R. at 255a) (emphasis added). In the Zoning Officer's February 23, 2018 memorandum to the ZHB, he stated that Atlantic Wind's proposed permanent meteorological tower was "a part of this [P]roject under the proposed use." R.R. 297a; *see also* R.R. at 681a, 933a, 1199a, 1474a. Although the Zoning Officer's February 23, 2018 memorandum was listed among the exhibits presented before the ZHB, *see* ZHB Dec. at 2 (R.R. at 49a), Exs. A11, B5, the ZHB did not make any findings of fact or conclusions of law relative to the Zoning Officer's opinion. Where, as here, a zoning hearing board does not denounce a zoning officer's interpretation, it is entitled to some weight. *See Bethlehem Manor Vill., LLC v. Zoning Hearing Bd. of the City of Bethlehem*, 251 A.3d 448 (Pa. Cmwlth. 2021).

In addition, at the Application hearings, Craig Poff (Poff), Director of Business Development for Atlantic Wind's parent company, Avengrid Renewables, confirmed that Atlantic Wind previously obtained conditional use approval for the temporary meteorological towers. Poff testified that, since the permanent meteorological tower is appurtenant to the Project, Atlantic Wind did not apply for conditional use approval for the tower. *See* R.R. at 1057a-1060a. Specifically, Poff clarified that the permanent meteorological tower is "an appurtenant [(not accessory)] use to the construction of wind turbines. You must have a permanent meteorological tower for the instrumentation independent of wind turbines." R.R. at 1059a; *see also* R.R. at 1060a-1062a.

Michael Kissinger (Kissinger), senior project manager and engineer responsible for the Project site plan, confirmed that the proposed permanent meteorological tower is not a communications tower, and it is integral to the Project and, thus, conditional use approval was not required. *See* R.R. at 1192a-1193a, 1197a, 1201a, 1326a-1327a.

Notwithstanding, regarding the proposed permanent meteorological tower, the ZHB found:

> 34. The site plan proposed by Atlantic Wind[,] as well as Atlantic Wind's [A]pplication[,] proposes a permanent [m]eteorological [t]ower.[35]
>
> . . . .
>
> 37. [Atlantic Wind] provided no testimony why the proposed permanent [m]eteorological [t]ower was part of the turbine use.
>
> 38. [Atlantic Wind] provided no testimony indicating why the permanent [m]eteorological [t]ower was accessory to the turbine use.

ZHB Dec. at 10-11, FOFs 34, 37-38 (R.R. at 57a-58a).

> The ZHB concluded:
>
> 23. The permanent meteorological tower does not qualify as an accessory structure and requires [c]onditional [u]se [a]pproval, which approval has not been obtained.
>
> . . . .
>
> 27. Since [Atlantic Wind] failed to meet its burden with regard to a special exception to [sic] the [Project], the permanent [m]eteorological [t]ower is not permitted as an accessory use or structure.
>
> 28. For the reasons set forth regarding a dual use of the principal use of the [Project Area], the permanent [m]eteorological [t]ower as a special exception is not authorized in the R[-]1 or R[-]2 Zoning Districts.

ZHB Dec. at 15-16, COLs 23, 27-28 (R.R. at 62a-63a).

Atlantic Wind had the burden of proving that the proposed meteorological tower was either so customary and incidental to the Project that

---

[35] *See also* ZHB Dec. at 15, COL 22 (R.R. at 62a) ("The Atlantic Wind site plan and Application reflect that the permanent meteorological tower is proposed in connection with the [Project].").

separate approval was not necessary, or that it was permitted by special exception. Importantly, the ZHB admitted the Zoning Officer's opinion into evidence, but did not consider it while scrutinizing the Application. Based on this Court's review, the Zoning Officer's opinion, together with Poff's and Kissinger's testimony, was sufficient evidence to meet Atlantic Wind's burden of showing that the proposed permanent meteorological tower was part of the Project. The ZHB's failure to recognize all of that evidence, particularly its Zoning Officer's opinion, was an abuse of discretion. Accordingly, this Court reverses the portion of the trial court's order affirming the ZHB's denial of the Application relative to the proposed permanent meteorological tower.

## Conclusion

Based on the foregoing, this Court reverses the portions of the trial court's order upholding the ZHB's decision denying the special exception as a second principal use and denying approval for the permanent meteorological tower. This Court otherwise vacates the trial court's order and remands this matter to the trial court for remand to the ZHB to make findings of fact and conclusions of law consistent with this Opinion, specifically regarding which metric applies to measure the Project's noise level pursuant to Section 402.A.54.p of the Ordinance and the basis therefor, and whether the Project would comply with the Ordinance.


_____
ANNE E. COVEY, Judge


Judges Fizzano Cannon and Crompton did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Atlantic Wind, LLC | : | |
| | : | |
| v. | : | |
| | : | |
| Zoning Hearing Board of Penn<br>Forest Township | : | |
| | : | |
| Bethlehem Authority | : | |
| | : | |
| v. | : | |
| | : | |
| Zoning Hearing Board of Penn<br>Forest Township | : | |
| | : | |
| Appeal of: Bethlehem Authority | : | No. 585 C.D. 2020 |
| | : | |
| Atlantic Wind, LLC,<br>            Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| Penn Forest Township<br>Zoning Hearing Board | : | No. 591 C.D. 2020 |
| | : | |
| Bethlehem Authority | : | |
| | : | |
| v. | : | |
| | : | |
| Penn Forest Township Zoning<br>Hearing Board | : | |
| | : | |
| Appeal of: Atlantic Wind, LLC | : | No. 20 C.D. 2021 |
| | : | |
| Bethlehem Authority,<br>            Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| The Zoning Hearing Board of<br>Penn Forest Township | : | No. 242 C.D. 2021 |

## O R D E R

AND NOW, this 12th day of January, 2022, the Carbon County Common Pleas Court's (trial court) May 29, 2020 order is REVERSED in part, and VACATED in part.  The matter is REMANDED to the trial court for remand to the Penn Forest Township Zoning Hearing Board for further action consistent with this Opinion.

Jurisdiction is relinquished.


_____
ANNE E. COVEY, Judge